**STATE of Minnesota, Respondent,**

v.

**Russell John HURD, Appellant.**

**No. A08–0539.**

Supreme Court of Minnesota.

March 26, 2009.

Lawrence Hammerling, Chief State Appellate Public Defender, Roy G. Spurbeck,

Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Doug Johnson, Washington County Attorney, Robert Molstad, Assistant County Attorney, Stillwater, MN, for respondent.

## OPINION

GILDEA, Justice.

In 1993, a jury found appellant, Russell John Hurd, guilty of one count of first-degree murder and one count of second-degree murder for the 1981 homicide of Viola Linnerooth. Based on the first-degree murder conviction, the district court sentenced Hurd to life in prison. Hurd appealed his conviction to this court, but obtained a stay of the appeal in order to pursue postconviction relief. The postconviction court denied Hurd's first petition for postconviction relief in 1996; Hurd did not appeal that ruling or otherwise seek to reinstate his direct appeal.

Hurd filed a second petition for postconviction relief in 2007, which the postconviction court denied. The 2007 postconviction court summarily denied most of Hurd's claims. After an evidentiary hearing on Hurd's remaining claim-a motion for a new trial based on new evidence—the postconviction court denied Hurd's request for postconviction relief. Hurd appeals from the denial of his petition. We affirm.

This case arises from the July 1981 death of Viola Linnerooth. A 12–year–old boy discovered Linnerooth's body sometime in the afternoon of July 18, 1981, near the old prison in Stillwater, Minnesota. Linnerooth's body was bloody and partially stripped. The State's expert forensic scientist testified that Linnerooth's death occurred at least 10 to 12 hours prior to discovery and resulted from hemorrhaging caused by blunt trauma and stab wounds applied during sexual assault.

The record reflects that the State arrested Hurd on July 20, 1981, and charged him with Linnerooth's murder. But the charges were subsequently dropped for lack of sufficient evidence to proceed. Twelve years later, with new evidence obtained in a cold-case investigation, the State again arrested Hurd for the Linnerooth murder. On March 8, 1993, a grand jury indicted Hurd on one count of first-degree murder, one count of second-degree murder, and one count of third-degree murder for Linnerooth's homicide. The case proceeded to trial later in 1993.[1]

The evidence at trial established that Hurd was seen in Stillwater, Minnesota on July 17, 1981, drinking beer with B.H., a "bar room friend." Witnesses also said that they saw Hurd wearing a knife on his belt.[2] B.H. testified that he and Hurd met on July 17 around 2:30 p.m. and went to a bar. They subsequently left the bar and proceeded to Hurd's residence, to another bar, to a liquor store, and then to Lowell Park. Around 8 p.m., Hurd and B.H. were seen leaving Lowell Park. B.H. testified that Hurd was not with him when he left Lowell Park. At about 9 p.m., B.H. was seen at Jim Beam's Bar with a woman, J.M., but without Hurd. B.H. testified that he remained at the bar until closing at 1 a.m., and a witness corroborated that B.H. was there at least until midnight.

1. In September of 1993, Hurd filed a pretrial motion to dismiss the indictment on grounds that since-deceased witnesses were necessary for trial, evidence was missing, and a delay of speedy trial violated his constitutional rights. The trial court denied the motion to dismiss the charges as well as another motion to suppress the State's evidence.

2. Hurd denied wearing a knife that evening.

Meanwhile, Hurd was observed entering John's Bar, also in Stillwater, with Linnerooth, at about 10:15 p.m. Hurd and Linnerooth left the bar together shortly after arriving. A Stillwater police officer testified that he saw Hurd and Linnerooth together—both of whom he knew from previous contacts—north of Lowell Park on the roadside between 10:30 p.m. and 11 p.m. Linnerooth appeared "extremely intoxicated," according to the officer, and Hurd was pulling her to her feet from where she sat on the roadway. The officer stopped to observe Hurd and Linnerooth on the road, but continued on after he determined they could walk. The officer explained that he saw Hurd and Linnerooth about a quarter of a mile from the site where Linnerooth's body was later discovered.

The State also offered the testimony of Billie Ann, who described herself as Hurd's friend.[3] Billie Ann testified that, between 10:30 p.m. and 11 p.m., she returned home, entered her kitchen and began making coffee. Sometime around 11 p.m., while she was still in the kitchen and before the coffee brewed completely, Hurd appeared at the door of her Stillwater home. Upon opening the door, she believed that Hurd looked "like he [had] seen the devil himself" because "there was so much fear in his eyes." She observed that Hurd had blood on his shirt, pants, and hand. Billie Ann said that she led Hurd inside and questioned what had happened, to which Hurd eventually responded, "I raped her," and, "I killed her." Billie Ann further questioned Hurd as to the identity of the person who had been raped and killed, and Hurd answered, "Vi."[4]

Billie Ann testified that she processed the information for a period, then set out to get Hurd cleaned up, not admitting to herself that the blood on the clothes could have been from someone other than Hurd. She took Hurd's clothes and put them into the washing machine. The clothes included a pair of blue pants, which the State contended were the same pants that were later found at Hurd's Stillwater residence. Billie Ann explained that, while the clothes were in the machine, she sat with Hurd and "tried to calm him down." As she sat with Hurd, Billie Ann observed a knife on the nearby table.

According to Billie Ann, Hurd remained at her house for approximately one to two hours. Even though the clothes were not dry, Hurd requested his clothes from Billie Ann because he wanted to leave. After Hurd left, Billie Ann noticed that the knife was gone. Billie Ann testified that she felt scared after this incident and did not tell anybody about what had happened because, she said, "A friend came to me and I just-I didn't dare say nothing."

Billie Ann kept this secret for several years. But on February 17, 1993, Stillwater police contacted her husband, B.H., for further information in the cold-case investigation of the Linnerooth murder. Billie Ann and B.H. married sometime after the murder. Although the police did not initially question Billie Ann, one officer did speak to her while the other officer continued to question to B.H. Billie Ann decided to tell both officers everything. Billie Ann testified that, after sharing her story, she became scared and wrote a note to one officer saying that she told an "untruth." Billie Ann stated at trial, however, that the story she told to the jury was the same she told to the officers and that it was the truth.

---

3. At trial, Hurd denied any acquaintance with Billie Ann.

4. Hurd referred to Linnerooth as "Vi."

In addition to Billie Ann's account, the State offered the testimony of Hurd's friend, G.G., and G.G.'s babysitter. The babysitter, who was 10 years old in July of 1981, explained at trial that sometime after midnight, possibly close to 1 a.m. or 1:30 a.m., on July 18, a man knocked at the door of G.G.'s house. The babysitter answered the door, and the man identified himself as "Russ." The babysitter testified that she recognized the man as G.G.'s friend. G.G. was home at the time, and she testified that when she was told that "Russ" was at the door she understood that to mean appellant, Russell Hurd. The babysitter told the man that G.G. was sleeping, so the man indicated he might come back later, and left.

The State also offered testimony from M.P., who testified that he ran into Hurd at Reed's Drugstore in Stillwater during the early afternoon of July 18, 1981. According to M.P.'s testimony, he and Hurd spent the afternoon "bumming around" the town and searching for money for alcohol. At some point, Hurd gave M.P. several coupons from the food stamp program, though neither Hurd nor M.P. was a program participant.

Hurd and M.P. eventually entered the Hidden Valley Lounge looking for B.H. B.H. testified that Hurd approached him and asked to travel with B.H. back to B.H.'s home in Cushing, Wisconsin. B.H. agreed, and B.H., Hurd, and M.P. set out toward M.P.'s truck. According to B.H., Hurd appeared nervous and indicated that the police were after him for a "bum rap." On the way to the truck, a police officer drove past the men; when the officer was out of sight, Hurd took off running, though B.H. and M.P. continued to walk. M.P. testified that when the three men got into the truck, Hurd bent over below the dash and indicated that, if something big were

discovered in Stillwater, he might be implicated.

On the way to Cushing, a radio news program reported that a woman was killed in Stillwater, and B.H. testified that Hurd wondered aloud whether the victim could have been "Vi." Hurd denied to B.H. any involvement in the murder, but he did ask B.H. to say that B.H. had been with him on Friday night, July 17. Hurd also told B.H. that, two days earlier, he had sold his knife to someone in Stillwater.

B.H. and M.P. left Cushing on July 19, though Hurd remained behind at the house. Before they left, Hurd took M.P.'s contact information so that Hurd could call M.P. to find out whether Stillwater police were looking for him.

Also on July 19, G.G., whose door Hurd reportedly knocked on the night of the murder, drove to Cushing with a friend, J.M., who was seen with B.H. on the night of the murder at Jim Beam's Bar. G.G. and J.M. were looking for B.H., and when they arrived at his house, they knocked and saw Hurd bending down inside. Hurd then approached them from around the back of the house. J.M. testified that Hurd told the women that he knew the police were looking for him and that he did not want to talk to the police.

The next day, July 20, 1981, an investigator and two other officers from Washington County, Minnesota, interviewed Hurd at a park in downtown Cushing, Wisconsin, where Hurd had agreed to meet with them. The officers informed Hurd of his rights, and Hurd said he understood them and agreed to talk with the officers. Hurd denied any knowledge of the crime beyond what he had heard on the radio and emphatically denied having seen Linnerooth at all on July 17.

Hurd told the officers that on July 17 he had been drinking with B.H. and that he

and B.H. went from Lowell Park to the Boom Company bar together. Hurd said that he and B.H. left the Boom Company after 10 p.m. and went swimming in the St. Croix River, leaving their clothes on the shore. While swimming, Hurd was separated from B.H. and did not rejoin B.H. that evening. Hurd told officers that he went directly home after swimming, at approximately 1 a.m.

When the interviewing officer confronted Hurd with B.H.'s story that B.H. was not with Hurd during the night of July 17, Hurd responded that B.H. was lying. In response to questioning about why a pair of blue trousers were found wet in his home, Hurd answered that his mother must have washed them. The investigator also questioned Hurd about his knife, to which Hurd responded that he now had a military-type knife and a pocket knife, and that he had possessed a cheap hunting knife but sold it a long time ago.[5] Hurd further denied being in possession of any food stamps on July 17 or 18. When confronted with the stamps that the police recovered from M.P., Hurd recalled that he had given them to M.P. and he told the police, "I suppose they are Vi's." Subsequent investigation confirmed that these particular stamps did belong to Linnerooth and her husband.

In addition to the evidence from the investigation performed in 1981, the State also offered evidence showing that Hurd

contacted the Stillwater police during the summer of 1989. Hurd said that he had information regarding the Linnerooth murder and asked to speak with a particular sergeant. The sergeant testified that Hurd said that he was at the scene of the homicide and that a person named C.A. stabbed Linnerooth.[6]

A person who shared a jail cell with Hurd in January of 1993, when Hurd was being held for a different offense, also testified. He described a conversation he had with Hurd where they discussed the plausibility of committing murder without being caught. During this conversation, Hurd said that he had committed murder before and that the State could not prove it. A second cellmate also testified and corroborated the conversation.[7]

In addition to the witness testimony described above, the State also introduced many photographs into evidence. The State introduced 29 photographs of Hurd, taken in 1981 shortly after the murder, depicting various abrasions, scratches, and scabs.[8] The State also offered, without objection, 16 photos of the crime scene depicting the landscape and various items found around the area.

Finally, the State offered two exhibits—numbered 53 and 54—each displaying several photos depicting Linnerooth's body and various aspects of the autopsy. Hurd objected on the grounds that the photos

---

5. The State introduced evidence that Linnerooth's stab wounds could have been caused by a hunting knife about the size that witnesses saw Hurd wearing on his belt on July 17.

6. On February 23, 1993, a cold-case investigator contacted Hurd, and Hurd related that on the morning of July 18, 1981, C.A. had told him that C.A. murdered Linnerooth. But at trial, Hurd denied ever implicating C.A., and he also denied being present at the scene of the murder.

7. Hurd denied that such a conversation took place.

8. As part of its case in chief, the defense called an expert witness who testified that Hurd's wounds were of varying ages and that the wounds were not consistent with either "defensive" or "offensive" wounds often found on assault perpetrators.

were inflammatory and overly prejudicial.[9] Exhibit 53 contained two individual pictures and two "sets of pictures" taken in the medical examiner's office in St. Paul. One individual picture depicts the body as it was found partially undressed, and the second individual photo depicts a full-face image of the victim. With respect to the sets of pictures, one set depicts the body after it was cleaned showing five wounds, and the second set depicts six stab wounds on the subject's facial region, a black eye, and abrasions. Exhibit 54 contained four individual photographs taken at the crime scene. The first photo depicts the landscape and a portion of the body. The second shows the body in a clearing adjacent to a large stone. The third depicts an overhead shot of the body, with clothes askew and "a fair amount of hemorrhage." And the fourth depicts Linnerooth's facial region, showing a number of wounds and hemorrhaging, and sticks and leaves in her hair.

On December 5, 1993, the jury found Hurd guilty of one count of first-degree murder during sexual assault in violation of Minn.Stat. § 609.185(2) (1980),[10] and one count of second-degree murder in violation of Minn.Stat. § 609.19 (1980).[11] The jury found Hurd not guilty on the third-degree murder count under Minn.Stat. § 609.195(2) (1980).[12] The district court convicted Hurd, and imposed a life sentence based on the first-degree murder conviction.

Hurd filed a direct appeal to this court on March 4, 1994, and thereafter received a stay of his direct appeal in order to pursue postconviction review. In his subsequent pro se postconviction petition, Hurd argued that he was entitled to a new trial based on a number of claims, including: (1) the State failed to present sufficient evidence, (2) the trial court erred when it denied his motion to dismiss the indictment based on an alleged speedy trial violation, (3) the trial court engaged in improper communications with jurors, and (4) an affidavit of D.P. cast doubt on the truthfulness of Billie Ann's trial testimony. The postconviction court denied Hurd's petition, finding that his claims were without merit.

On July 31, 2007, Hurd filed a second petition for postconviction relief pro se,

---

9. The actual photographs Hurd challenged at trial are not part of the record received in this court, but sufficient descriptions and analysis of each picture exists in the record for us to address the possible prejudice raised by these images.

10. The first-degree murder statute provided:

Whoever does [the following] is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

. . .

(2) Causes the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting such person or another. Minn.Stat. § 609.185 (1980).

11. The second-degree murder statute provided: "Whoever causes the death of a human being with intent to effect the death of such person or another, but without premeditation, is guilty of murder in the second degree and may be sentenced to imprisonment for not more than 40 years." Minn.Stat. § 609.19 (1980).

12. The third-degree murder statute provided:

Whoever, without intent to effect the death of any person, causes the death of another by . . . the following means, is guilty of murder in the third degree and may be sentenced to imprisonment for not more than 25 years:

. . .

(2) Commits or attempts to commit a felony upon or affecting the person whose death was caused or another, except criminal sexual conduct in the first or second degree with force or violence within the meaning of section 609.185. Minn.Stat. § 609.195 (1980).

alleging seven grounds on which to vacate the 1993 conviction. Hurd's subsequently-obtained attorney filed a supplemental memo in support of Hurd's petition. The postconviction court summary denied six of the seven claims. But the court ordered a hearing on the seventh ground of newly discovered evidence. Following that hearing, the court denied Hurd's petition on the seventh ground because the court found Hurd's new evidence doubtful. From these orders denying relief on his second postconviction petition, Hurd appeals to this court.

## I.

Hurd raised seven claims in his second postconviction petition. The postconviction court summarily dismissed the first six claims.[13] The court summarily denied relief on the claims relating to the sufficiency of the evidence, the delay in seeking an indictment, the trial court's communications with the jury, and D.P.'s affidavit because those claims had been asserted in Hurd's earlier petition for postconviction relief. See Minn.Stat. § 590.04, subd. 3 (2008) ("The court may summarily deny a second or successive petition for similar relief on behalf of the same petitioner . . . ."). The court denied relief on the other two claims because it concluded that the Knaffla procedural bar operated to preclude consideration of the merits of those claims. See State v. Knaffla, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976) (holding that matters raised on direct ap-

peal, or to a postconviction court, and matters that were known or should have been known but were not raised at the time of direct appeal or postconviction petition are not eligible for further review). Hurd does not expressly argue that the postconviction court erred in summarily denying his claims. Rather, he argues that the interests of justice dictate that this court review the merits of all of his claims on appeal.

We have recognized an interests of justice exception to the Knaffla bar. See, e.g., Powers v. State (Powers II), 731 N.W.2d 499, 502 (Minn.2007) (recognizing interests of justice exception to Knaffla bar). Without deciding whether this exception applies generally in the context presented here, we will consider the merits of Hurd's claims because Hurd was convicted of first-degree murder and sentenced to life imprisonment, because he has had no appellate review, and because determination of whether the interests of justice exception to the Knaffla bar applies itself contemplates some assessment of the merits. Powers II, 731 N.W.2d at 502; see also Spears v. State, 725 N.W.2d 696, 701 (Minn.2006) ("Because Spears's Apprendi claims have substantive merit and his failure to raise them on direct appeal was not deliberate or inexcusable, we hold that the court of appeals erred in determining that Spears's Apprendi claims were procedurally barred.").[14]

### A. Sufficiency of the Evidence

▬▬▬▬ In his first claim, Hurd argues that the evidence is not sufficient to estab-

---

13. The six claims at issue relate to: the sufficiency of the evidence; the State's alleged delay in seeking an indictment; the circumstances of Hurd's interview with police; the admission of photographs during trial; the trial court's communications with the jury; and Hurd's claim that the affidavit of D.P. casts doubt on the truthfulness of Billie Ann's trial testimony.

14. In addition, for the interests of justice exception to apply, the appellant "must not have 'deliberately and inexcusably' failed to raise the issue on direct appeal." Powers v. State (Powers I), 695 N.W.2d 371, 374 (Minn.2005) (internal citation omitted). Because, as set forth below, we conclude that there is no merit to any of Hurd's claims, we do not reach the question of whether Hurd's delay was deliberate and inexcusable.

lish beyond a reasonable doubt that he killed Linnerooth. When reviewing whether the evidence is sufficient to support a conviction, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). Circumstantial evidence receives the same weight as all other evidence. *Id.* We assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989).

Hurd alleges that the State's case leaves grave doubts as to whether Hurd could have accomplished a murder in the timeline described by the State's witnesses. Specifically, Hurd argues that if, as the officer testified, he was seen walking with Linnerooth sometime between 10:30 and 11 p.m., there was not enough time for him to commit the murder and dispose of the body, and still arrive at Billie Ann's house, covered in blood, around 11 p.m. But the evidence as to the time of events recited at trial was often approximate because many witnesses relied on memories more than 12 years old, and no account of timing provided by the witnesses created unreasonable inconsistencies in the State's case. When viewed in a light most favorable to the verdict, it would not have been unreasonable for the jury to believe the timeline constructed by the State's witnesses, and conclude that under that timeline, Hurd had time to commit the murder before he arrived at Billie Ann's house.

Hurd further argues that the State's evidence is insufficient because the State offered no solid forensic evidence, did not produce the murder weapon, and offered no motive evidence. As for forensic evidence, the State offered testimony of a witness from the Bureau of Criminal Apprehension (BCA) who described that he found human blood on four articles of Hurd's clothing. The items of clothing included a pair of blue corduroy jeans, a tan shirt, a pair of underwear, and a tank top. Billie Ann identified the jeans as the pants she washed for Hurd on the night of the murder. The BCA witness also testified that the stains on Hurd's jeans appeared to have been scrubbed because "[t]hey smelled like soap and the remainder of the garment did not smell like soap." While Hurd testified that the blood found on his jeans was from previous fights, the jury was not required to accept this explanation. Rather, a reasonable jury could have concluded that blood found on the clothes that Hurd allegedly wore on the night of the murder belonged, at least in part, to Linnerooth.

With respect to the murder weapon, the State offered evidence that the Linnerooth's death was caused, at least in part, from stab wounds. The State also offered testimony regarding the size of the knife probably used to inflict the wounds, along with the testimony of four witnesses who said that they saw Hurd carrying a similar knife attached to his belt on the day of the murder.

Finally, regarding motive evidence, we have recognized that motive evidence is not required for the evidence to be sufficient to sustain a conviction. *See Webb*, 440 N.W.2d at 431. Moreover, the State contends that the food stamps found in Hurd's possession were taken from Linnerooth. There was also evidence presented that Linnerooth had been sexually assaulted. Either or both of these events could have provided a motive for the murder.

We have painstakingly reviewed the record. When the evidence is construed in the light most favorable to the verdict, it reveals the following: Hurd was seen on

the night of the murder with Linnerooth shortly before the time of her death. He was seen wearing particular items of clothing that were later collected from his residence and found to contain human blood, and he was seen carrying a knife that was consistent with the murder weapon. Hurd confessed to Billie Ann on the night of the murder that he killed Linnerooth. Hurd requested that B.H. provide Hurd with an alibi for the time period during which the murder took place. Finally, shortly after the murder, Hurd was in possession of Linnerooth's property. Under our standard of review, which assumes that the jury believed the State's witnesses and disbelieved evidence to the contrary, the jury could have found beyond a reasonable doubt that Hurd committed first-degree murder. Because the evidence is sufficient to sustain the conviction, there is no merit to the first claim in Hurd's second postconviction petition.

### B. Delay in Seeking Indictment

In the second claim in his petition, Hurd argues that the district court erred when it denied his 1993 pretrial motion to dismiss the indictment based on the 12–year delay between the crime and the indictment. On July 20, 1981, several days after Linnerooth's death, the State arrested Hurd and filed a complaint charging him with second-degree murder. The State dismissed the complaint and released Hurd on August 20, 1981. Hurd was not indicted on the 1981 charge, nor does the record support that Hurd expressed a desire in 1981 to proceed to trial for the resolution of the charge.[15]

On February 23, 1993, Hurd was again arrested for the Linnerooth murder. A grand jury indicted Hurd for the crime on March 8, 1993. Hurd filed a motion to dismiss the indictment on September 2, 1993, based on the State's delay in bringing charges against him, which the trial court denied on September 21. On appeal and in his second petition for postconviction relief, Hurd contends that the 12 years between the dismissal of the 1981 complaint and the 1993 indictment constitute an impermissible delay that violates his constitutional rights to due process and to a speedy trial.

■ In support of his claim that the delay in prosecution violated his right to due process, Hurd relies on *United States v. Sturdy*, 207 F.3d 448 (8th Cir.2000). The court recognized in *Sturdy* that a defendant's right to due process may be violated by the government's delay in prosecution if the defendant suffered actual prejudice from the delay, and the government intentionally delayed the prosecution to secure a tactical advantage. *Id.* at 451–52. Even if, as Hurd argues, he adequately demonstrated that the delay caused him actual prejudice, his due process claim still lacks merit. There is no evidence in the record that the State delayed Hurd's prosecution for a tactical reason. *See Leake v. State*, 737 N.W.2d 531, 535 (Minn.2007) ("Allegations in a postconviction petition must be 'more than argumentative assertions without factual support.'" (quoting *Hodgson v. State*, 540 N.W.2d 515, 517 (Minn.1995))). Rather, the record establishes that the State proceeded with the case after Billie Ann came forward in 1993

---

15. In an affidavit filed in support of his original motion to dismiss, Hurd averred that he demanded a speedy trial in 1981 after his arrest. In Hurd's first postconviction petition, filed in 1994, he said that he asked his public defenders in 1984 to "do whatever was necessary to cause the Linnerooth matter to be brought to the District Court and dispensed with." But Hurd failed to request transcripts from any of the 1981 proceedings. Consequently, the record before us does not support Hurd's claim that he demanded a speedy trial in 1981.

with evidence that Hurd confessed to the crime. Hurd's due process claim therefore fails.

■ With regard to his right to a speedy trial, Hurd cites *State v. Artz*, 154 Minn. 290, 294, 191 N.W. 605, 606 (1923), and he seemingly argues that because he told his public defender he wanted to go to trial when he was first arrested in 1981, his right to a speedy trial has been violated. In *Artz*, we said that "[t]he period in which a speedy trial may be had begins to elapse from the time the accused evinces a readiness to go to trial." *Id.* But *Artz* presents a case much different from this one.

In *Artz*, a grand jury indicted the defendant for the murder of two victims. The first murder charge went to trial and the defendant was acquitted. *Id.* at 291, 191 N.W. at 605. When the verdict on the first charge was returned, the defendant demanded trial on the other charge, and the trial was set to begin eight days later. *Id.* On the appointed date for the second trial to begin, the defendant was personally present with his attorney and witnesses ready for trial, and so announced to the court. *Id.* But the State stated to the court that [it] had no evidence to submit, except that introduced by the prosecution in the first trial, and asked that the indictment be dismissed. *Id.* at 292, 191 N.W. at 605. The district court granted the States request to dismiss the second indictment. *Id.* The State did not attempt to prosecute the defendant on the second indicted charge until 10 years had passed. *Id.* We held that the time which has elapsed since the accused demanded a trial upon the charge with which he now stands indicted, is so unreasonable as to constitute a bar to further prosecution thereon. *Id.* at 294, 191 N.W. at 606.

This case does not involve a similar unreasonable delay, and *Artz* does not support a conclusion that Hurds right to a speedy trial was violated. Hurd was indicted only once, in 1993, approximately nine months before the trial began.[16] And, most importantly for purposes of the rule applied in *Artz*, the record does not establish that Hurd ever made a demand in 1981 to go to trial before the 1981 charge was dismissed. Similarly with respect to the 1993 charges, the record does not demonstrate that Hurd made any demand for a speedy trial. Hurds claim that his right to a speedy trial was violated therefore fails on the merits.

Because the alleged delay in pursuing the indictment was not unreasonable or in violation of Hurds due process or speedy trial rights, there is no merit to the second claim in Hurds second postconviction petition.

### C. Testimony Regarding Circumstances of a Police Interview

■ In the third claim in his petition, Hurd argues that the district court erred when the court sustained the State's objection to portions of Hurd's testimony that would have described the circumstances of his 1981 interview by three police officers at a park in Cushing, Wisconsin. We review district court rulings on evidentiary issues for abuse of discretion. *State v. Henderson*, 620 N.W.2d 688, 698 (Minn. 2001).

Taking the stand in his own defense, Hurd testified that he initially refused to answer the officers' questions after he received a *Miranda* warning, but that his

---

**16.** Hurd was arrested on February 23, 1993, indicted on March 8, 2003, and his trial began on November 29, 1993. Hurd makes no argument that the time period between his arrest and the commencement of his trial violated his right to a speedy trial or due process.

probation officer, who was also present, told him it would be in his best interest to answer the questions. On direct examination, Hurd's attorney asked, "Did [the probation officer] elaborate on that, on what he meant by it would be in your best interests [to answer questions]?" The State objected and argued that further testimony about the probation officer's statements to Hurd would have been hearsay. Hurd's attorney argued that the probation officer's statement was not offered for its truth, but was offered to show "the facts and circumstances under which [Hurd] made the statement [to the police]." Such facts and circumstances, according to Hurd, would include the probation officer's statements showing that the officer encouraged Hurd to talk. The State responded that the probation officer's statements would be offered to show that Hurd's answers at the interview were not voluntary, and that the issue of voluntariness had been already decided in the omnibus hearing before trial. The trial court agreed with the State that voluntariness had been already litigated and that these statements would serve no other purpose, and it sustained the State's objection.

The right to present evidence attacking the credibility of a confession is derived from the guarantee that a criminal defendant must have " 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)); *Bixler v. State*, 582 N.W.2d 252, 255 (Minn.1998). The ability to present a complete defense is compromised if a defendant who previously confessed to the crime cannot an-

swer the jury's implicit question: "If the defendant is innocent, why did he previously admit his guilt?" *Crane*, 476 U.S. at 689, 106 S.Ct. 2142.

But Hurd did not confess to any crime in the Cushing police interview. Instead, Hurd attempts to discredit his statements to the police because some of those statements are inconsistent with his testimony at trial.[17] Even if the rationale of *Crane* was applicable in this situation, and the trial court could therefore be said to have erred, an issue we do not decide, any error is harmless on this record. *Crane*, 476 U.S. at 691, 106 S.Ct. 2142 (stating that harmless error analysis applies to determine if defendant's right to present a complete defense was violated); *State v. Greer*, 635 N.W.2d 82, 92 (Minn.2001) (concluding that any error was harmless because defendant was otherwise able to directly attack the credibility of his statement to police). As in *Greer*, Hurd had ample opportunity to explain the physical and psychological environment of the interview, and thereby attempt to undermine the credibility of his statement, even though he was not able to relate precisely everything that the probation officer allegedly said to him. Because Hurd was able to explain the circumstances of the interview, any error in refusing admission of the specific testimony was harmless beyond a reasonable doubt, and therefore there is no merit to the third claim in Hurd's petition.

### D. Admitted Photographic Evidence

In his fourth claim, Hurd argues that the trial court erred in admitting photographic evidence. At trial, Hurd objected to the State's introduction of exhibits 53 and 54, which displayed an approximate total of 10 to 20 photographs depicting

---

**17.** At least one court has held that the rule applied in *Crane* does not apply to statements where the defendant does not confess to a crime. *State v. Sperry*, 267 Kan. 287, 978 P.2d 933, 938 (1999).

the victim's body. The photos were taken both at the crime scene and during the autopsy. Hurd contends that the photos of Linnerooth's body are not relevant to the issue of the killer's identity, and that the testimony of the State's medical examiner regarding the manner of death negates the necessity of presenting the number of photographs that the State proffered. Hurd also argues that these photographs were unduly prejudicial and cumulative in violation of Minn. R. Evid. 403. The State responds that the quantity of the photos was modest, the photos were not unusually graphic, and the photos were relevant to aiding the jury's understanding of witnesses' testimony. Specifically, the State's medical examiner used the photos to explain to the jury that the victim died from being stabbed, the location of the fatal wound, and the location of a stab wound in the victim's genital area.[18] We review the admission of photographic evidence for abuse of discretion. *Dunn v. State*, 486 N.W.2d 428, 433 (Minn.1992).

Under the Minnesota Rules of Evidence, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. In general, relevant evidence is admissible. Minn. R. Evid. 402. But relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or by considerations of . . . needless presentation of cumulative evidence." Minn. R. Evid. 403.

■ The trial court did not make an explicit finding on the record on the probative value of each photo admitted. Hurd,

however, did make an objection specifically on grounds of relevance and prejudicial effect, to which the court responded by privately reviewing each of the photos. The State ultimately introduced only some of the photos that the State possessed. We agree with the State that the trial court properly concluded that these photos helped the jury to follow the medical examiners explanation of the death as well as to understand the scene described by the witness who discovered Linnerooths body. The photographs therefore were relevant.

With respect to whether the probative value was substantially outweighed by the prejudicial effect of the evidence, we have previously determined that it was not error to admit gruesome pictures of the victim's body where the pictures have not been shown to be distorted or to inaccurately portray the subject matter. *State v. DeZeler*, 230 Minn. 39, 46, 41 N.W.2d 313, 318 (1950). In *DeZeler*, we noted that a "horrible, revolting, and ghastly" depiction was "an inherent and inseparable part of the facts which were relevant to a full consideration of material issues by the jury." *Id.*, 41 N.W.2d at 318–19. The material issues, moreover, included "the nature and location of the death wound," the time of death, and the manner in which the killer attempted to conceal the body. *Id.*, 41 N.W.2d at 318; *see also State v. Morton*, 701 N.W.2d 225, 228, 237 (Minn. 2005) (holding that "grisly" photos were relevant to show elements of first-degree and second-degree murder and admissible where medical examiner testified to cause of death and probable killing during sexual assault); *Dunn*, 486 N.W.2d at 433 (holding that State did not introduce excessive number of autopsy photos corroborating examiner and eyewitness testimonies, nor

---

**18.** *The latter fact tends to show that the murder was completed during a sexual assault, which supports the State's case for first-de-* gree murder under Minn.Stat. § 609.185(2) (1980), the statute under which the State prosecuted Hurd.

was the content unduly prejudicial); *State v. Friend,* 493 N.W.2d 540, 544 (Minn. 1992) (holding that the trial court properly exercised its discretion to admit graphic photos where trial court "reviewed each photograph before admitting it, required an explanation as to the probative value of each questionable photograph, and explicitly balanced their probative value against their potential for creating unfair prejudice"). As in all of these cases, we likewise conclude here that the trial court did not abuse its discretion in admitting the photographs at issue. Accordingly, there is no merit to the fourth claim in Hurds petition.

### E. Trial Court's Communications with the Jury

█ In the fifth claim, Hurd argues that he is entitled to a new trial because the judge communicated with the deliberating jury without notifying Hurd or allowing him to be present. During the afternoon of the first full day of deliberations, the jury sent four questions to the trial court judge. The judge responded by recalling the jury into the courtroom and rereading several instructions, including the instruction on the presumption of innocence. While speaking to the jury, the judge noted that the jury seemed to be struggling to fulfill its function and commented that the jurors needed to get organized. The judge said:

> I know you are having a problem. I went by the jury room several times today and I could hear you talking. One thing it sounds to me like is that you probably all ought to calm down a little, get a little more organized, and don't let everybody speak at once. Get some kind of organizational pattern and try to analyze the case in an analytical manner. Remember, jurors have been deciding cases for hundreds of years. There are thousands and thousands of jury cases

every year in this country which get to reach a verdict. I know it appears difficult to you. It's difficult but it is your task as jurors.

This proceeding was electronically recorded, and a transcript was created from this recording. But the attorneys and Hurd were not present for this proceeding.

Hurd argues that the judge's communication with the jury violated his right to be present at every critical stage of his trial, and that the judge's statements telling the jury to "calm down" and to get "organized" constituted prejudicial error requiring a new trial. The State responds that the error was not prejudicial because the proceeding was recorded and transcribed and the judge did not tell a hung jury that it must deliberate until the jury reached a verdict. The State also argues that the court's election to re-read the presumption of innocence instruction alongside the instructions that were responsive to the jury's specific questions demonstrates that the court took care so as not to prejudice the defendant.

We first examine whether the communication constitutes error. The Minnesota Rules of Criminal Procedure require a defendant to be present "at every stage of the trial." Minn. R.Crim. P. 26.03, subd. 1(1). We have interpreted this rule to require the defendant's presence when a court responds to questions posed by a deliberating jury. *State v. Kelley,* 517 N.W.2d 905, 908 (Minn.1994). We therefore agree with Hurd and the first postconviction court that the trial court erred when it did not provide Hurd with the opportunity to be present when the court responded to the jury's questions.

█ But a defendant is not entitled to a new trial on these grounds unless the error was prejudicial. *Kelley,* 517 N.W.2d at 908. Hurd has the burden to demonstrate that he was prejudiced by the error.

*Leake v. State,* 737 N.W.2d 531, 537 (Minn. 2007) (noting that it is appellant's burden to demonstrate that he was prejudiced by the court's erroneous communication with the jury). Hurd does not contend that he suffered any prejudice when the trial court simply re-read instructions it had already given. Rather, he relies on *Kelley* and argues that he was prejudiced because the trial court, in essence, instructed the jury that it had to reach a verdict.

In *Kelley*, we held that the trial court abused its discretion by sending the jury back to deliberate after the court was specifically informed that the jury remained deadlocked for at least five hours. 517 N.W.2d at 910. The court knew the count of the deadlock, 10 to 2 in favor of guilt, and declined to give the jury any instruction beyond keep deliberating. *Id.* at 909–10. Given the posture of that case, we reasoned that the simple instruction constituted coercion by the court to make the jurors think that they must deliberate until they reached a verdict, and we granted a new trial. *Id.* at 909, 911.

In *State v. Buggs*, however, we applied the *Kelley* analysis and concluded that a trial courts communications with the jury did not warrant a new trial. 581 N.W.2d 329, 338–39 (Minn.1998). In that case, we determined that the trial courts note to the jury in response to the jurys request that testimony be re-read to them did not coerce a deadlocked jury to reach a verdict. *Id.* at 338. The trial courts note read, try to resolve these issues yourselves, if you can do so, without my answering the questions for you or rereading the testimony. *Id.* at 337. After receiving a second note that the jury had reached an impasse, the court instructed the jury to continue deliberating. *Id.* The court notified the attorneys about the jurys request and the courts response, though it did not ask for the attorneys approval. *Id.* at 338.

On appeal, we did not grant a new trial because we concluded that the instruction to the jury merely informed the jurors of their role and did not coerce a unanimous verdict. *Id.* at 338–39.

In this case, the jury did not indicate that it was deadlocked. Instead, the jury posed four questions relating to previously read instructions. The trial court, apparently sua sponte, stated to the jury during the recorded proceeding, [Y]ou obviously are having problems making a decision. The trial court told the jury to calm down and suggested that they approach their task in an analytical manner. These instructions do not rise to the level of instructing a deadlocked jury that the jury must continue to deliberate until a verdict is achieved. The trial courts comments in this case are akin to those in *Buggs*, where the judge encouraged further deliberations despite the fact that he knew the jury was in deadlock. *Buggs*, 581 N.W.2d at 338. Because the trial court merely repeated instructions previously given, reminded the jury of its role, and encouraged orderly cooperation among jurors, Hurd has not demonstrated that he was prejudiced by the error, and his fifth claim therefore fails on the merits.

### F. D.P.'s Affidavit

The sixth claim Hurd brought in his second postconviction petition argued that the affidavit of D.P., who would testify on behalf of Hurd, casts doubt on the truthfulness of Billie Ann's trial testimony, warranting a new trial. Hurd does not argue the merits of this claim in his appeal to this court. In general, issues not raised in the parties' briefs are waived. *Melina v. Chaplin,* 327 N.W.2d 19, 20 (Minn.1982); *State Dep't of Labor Indus. v. Wintz Parcel Drivers, Inc.,* 558 N.W.2d 480, 480 (Minn.1997) (declining to address an issue not adequately briefed). We therefore do not reach this issue. Even if we did reach

this issue, D.P.'s affidavit is simply impeaching evidence and therefore would not warrant a new trial. *See Rainer v. State,* 566 N.W.2d 692, 695 (Minn.1997).

Because, as set forth above, there is no merit to the first six claims in Hurd's second postconviction petition, we hold that the postconviction court did not err in denying Hurd's petition as to these six meritless claims.

## II.

■ We turn next to consideration of the seventh claim in Hurds petition. After filing his second postconviction petition, Hurd amended the petition to assert a seventh claim based on newly discovered evidence of an alternative perpetrator in the Linnerooth murder. Before reaching the merits of the postconviction courts decision, we set forth the facts underlying the additional claim.

The basis of the seventh claim was provided through D.P., whom Hurd met in prison in 1994. Providing support for Hurd's first petition for postconviction relief, D.P. submitted a letter to the prosecutor on August 21, 1994, that attacked the credibility of Billie Ann. D.P.'s letter did not, at that time, mention an alternative killer. D.P. wrote a subsequent letter to Hurd's postconviction attorney dated July 31, 2007. The letter revealed information that D.P.'s brother, J.P., killed Linnerooth. The public defender's office interviewed D.P. with respect to this information on September 6, 2007.

The postconviction court held a hearing on January 25, 2008, to examine the relevance and possible weight of the new evidence that Hurd offered to prove that a different person killed Linnerooth. Hurd's trial attorney testified that he had never heard of D.P. or J.P., and that at the time of trial he had no knowledge of information either might have possessed. The

court continued the hearing on February 1, 2008, where D.P. testified that he lived in Stillwater during the 1970s, knew Hurd's family, and returned to Stillwater in 1981 after spending some time in prison. D.P. reported that, when he returned to Stillwater, he first learned about the Linnerooth murder from Billie Ann.

In September of 1981, according to D.P., he discussed the murder with his brother, J.P. D.P. testified that J.P. told him that J.P. killed Linnerooth. D.P. further stated that J.P. said that on the day of the murder he had gone to see Linnerooth to collect a debt owed to their father. J.P. reportedly told D.P. that when J.P. went to collect the debt, he and Linnerooth quarreled because Linnerooth either could not or would not pay, and that J.P. then repeatedly stabbed Linnerooth. D.P. testified that, while the two were drinking, J.P. told him this story because J.P. asked D.P. some uncomfortable questions about D.P.'s past crimes, and J.P. volunteered, "Look, I have been there too," before describing the Linnerooth murder. J.P. also allegedly told D.P. that J.P. had killed Linnerooth on the "prison side" of the road and disposed of the knife in the river.

D.P. further testified that he had not revealed this information before because, after meeting Hurd, he realized that Hurd would make the information public, and D.P. did not want to embarrass the stepmother of D.P. and J.P. Because their stepmother is now deceased, D.P. came forward with the information. D.P. likewise did not believe that J.P. is still alive, but D.P. said that he had not spoken to J.P. since 1991.

On cross-examination, D.P. said that J.P. had not mentioned Hurd being present at the crime scene, even though D.P.'s 1994 affidavit reports that Hurd was at the scene. The State also impeached D.P. by

showing that on a prior occasion, D.P. had recanted a similar exculpatory letter relating to a different case. Finally, D.P. admitted that he had been convicted of many felonies and had written letters in other cases claiming to have information that he offered in exchange for favors.

 Following the evidentiary hearing, the postconviction court found that D.P.'s testimony did not satisfy the standard for new evidence necessitating a new trial. We apply an abuse of discretion standard to review the postconviction court's determination of whether to grant a new trial based on new evidence. *Rhodes v. State*, 735 N.W.2d 315, 318–19 (Minn.2007). The evaluation of the postconviction court's ruling is "limited to a determination of whether there is sufficient evidence to sustain the postconviction courts findings." *Rainer*, 566 N.W.2d at 695. Finally, in a postconviction proceeding, Hurd, as the petitioner, bears the burden of proving facts alleged in the petition by a preponderance of the evidence. Minn.Stat. 590.04, subd. 3 (2008).

 Hurd argued that the information provided by D.P. constituted new evidence that entitled Hurd to a new trial. New evidence warrants a new trial where a defendant establishes (1) that the evidence was not known to him or his counsel at the time of trial, (2) that his failure to learn of it before trial was not due to lack of diligence, (3) that the evidence is material, and (4) that the evidence will probably produce either an acquittal at a retrial or a result more favorable to the petitioner. *Rhodes*, 735 N.W.2d at 318 (quoting *Race v. State*, 417 N.W.2d 264, 266 (Minn.1987)). The postconviction court found that Hurd did not carry his burden with respect to the new evidence presented in the testimo-

ny of D.P., and subsequently denied Hurd's claim for postconviction relief.

With respect to the first and second prongs of the new evidence test, the postconviction court found, and the State does not directly contest, that at the time of trial Hurd did not know of D.P.'s information that his brother, J.P., confessed to killing Linnerooth, nor could Hurd have discovered the information through due diligence. But the parties dispute whether Hurd has met his burden to satisfy prongs three and four. We resolve Hurd's claim of new evidence under the fourth prong.[19]

 We analyze the fourth prong of the new-evidence test by examining the admissibility and weight of the evidence introduced. *See Wayne v. State*, 498 N.W.2d 446, 448 (Minn.1993) (holding that the postconviction court did not abuse its discretion in finding that evidence would not have caused an acquittal or more favorable result because the defendant could not lay proper foundation for anonymous letter containing the evidence, so the letter could not be admitted); *Race v. State*, 504 N.W.2d 214, 218 (Minn.1993) (holding that the postconviction court did not abuse its discretion in finding that evidence would not have caused a more favorable result because other evidence introduced by the State at trial would have accounted for and discredited the defendant's new evidence). In *Rainer*, we affirmed the postconviction court's ruling that evidence contained in an anonymous letter would not have lead to an acquittal or a result more favorable for the defendant because the letter constituted inadmissible hearsay. 566 N.W.2d at 695–96. The postconviction court reached a similar conclusion in this case.

**19.** Because our analysis on the fourth prong is dispositive, we do not address the parties' arguments regarding whether the evidence is material, as required by the third prong.

The postconviction court found that J.P.'s statement reported by D.P. was hearsay. The court explored whether the statement was admissible under an exception to the hearsay bar, but did not make an explicit finding on the statement's admissibility under an exception. Instead, the court ultimately found that new evidence lacked credibility, and, when weighed against the other evidence presented at trial, would not be likely to produce an acquittal or a more favorable result.

Hurd argues that J.P.'s hearsay statement was admissible because the statement contains adequate circumstantial guarantees of trustworthiness. According to Hurd, J.P. is unavailable because he is believed to be dead, Minn. R. Evid. 804(a)(4), and his statement to D.P. therefore falls under the exception for the unavailable declarant's statement against interest. Minn. R. Evid. 804(b)(3).

The hearsay exception for statements against interest provides: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Minn. R. Evid. 804(b)(3). The statement, moreover, must be "so far contrary to [the declarant's] interest that a reasonable person would not have made the statement unless he believed it to be true." *Id.* cmt.

 Consistent with the plain language of the rule, we have interpreted the hearsay exception for statements against interest to apply to statements exculpating the accused only if the declaration against interest is "proven trustworthy by independent corroborating evidence that bespeaks reliability." *State v. Higginbotham,* 298 Minn. 1, 5, 212 N.W.2d 881, 883 (1973). In

*Higginbotham,* a declarant voluntarily confessed to police the crime for which the defendant was on trial. *Id.* at 3, 212 N.W.2d at 882. The declarant was unavailable to testify at the defendants trial because he exercised his Fifth Amendment rights. *Id.* at 4, 212 N.W.2d at 882. We concluded that the confession lacked independent corroborating evidence, and that the declarant had incentive to fabricate an exculpatory story because the defendant and the declarant were friends. *Id.* at 5, 212 N.W.2d at 883. We held that the exception for statements against interest was not satisfied and upheld the exclusion of the confession as hearsay. *Id.* at 5–6, 212 N.W.2d at 883. *Higginbotham* demonstrates our long-standing, clear rule that the statement-against-interest exception applies to exculpatory statements only where there is evidence corroborating the statement. *See also State v. Glaze,* 452 N.W.2d 655, 661 (Minn.1990) (affirming exclusion of confession from unavailable third party perpetrator because record did not contain evidence corroborating the confession).

Hurd does not argue that other evidence corroborates J.P.'s confession. Rather, he argues that when a defendant seeks to introduce evidence of an alternative perpetrator, the hearsay rules should be relaxed such that a statement against interest will be admitted if the statement shows an inherent tendency to connect the alternative person to the crime. *See State v. Hawkins,* 260 N.W.2d 150, 158–59 (Minn. 1977) ([E]vidence tending to prove that another person did the killing is admissible. . . . Once the necessary foundation is proven [of the inherent tendency of the evidence to link the person to the crime], it is permissible to introduce evidence of a motive of the third person to commit the crime, threats by the third person, or oth-

er miscellaneous facts which would tend to prove the third person committed the act.).[20] We reject Hurds implicit invitation that we depart from our precedent. Where the defendant seeks to introduce what would be otherwise excluded as hearsay, the defendant must work within the *Higginbotham* framework to provide corroborating evidence. *Glaze*, 452 N.W.2d at 660–61. Rather than lowering the threshold on circumstantial guarantees of trustworthiness for statements against interest, such evidence requires an enhanced showing of trustworthiness through independent corroborating evidence. *Id.* at 660 (citing *Higginbotham*, 298 Minn. at 4–5, 212 N.W.2d at 883). The enhanced guarantee of trustworthiness for such statements is necessary because hearsay ... tending to exculpate the accused must be regarded with suspicion. *Higginbotham*, 298 Minn. at 5, 212 N.W.2d at 883.

Because J.P.'s confession was not corroborated, it does not satisfy the exception for statements against interest. Minn. R. Evid. 804(b)(3). As inadmissible hearsay, J.P.'s statement would not result in an acquittal or a more favorable result for Hurd. We therefore hold that the postconviction court did not abuse its discretion by denying Hurd a new trial on new evidence grounds.[21]

Affirmed.

**20.** Hurd also relies on *State v. Vance*, 714 N.W.2d 428 (Minn.2006), and *State v. Blom*, 682 N.W.2d 578 (Minn.2004). But those cases, like *Hawkins*, do not discuss Minn. R. Evid. 803(b)(4). Those cases address the foundational showing required before the defendant may offer alternative perpetrator evidence. *Vance*, 714 N.W.2d at 436–39 (noting that defendant must lay foundation "connecting the alternative perpetrator to the commission of the crime with which the defendant is charged"); *Blom*, 682 N.W.2d at 621 (noting that alternative perpetrator evidence must have an "inherent tendency" to connect the alleged alternative perpetrator to the crime); *see also Hawkins*, 260 N.W.2d at 158–59.

**21.** Hurd submitted a supplemental pro se brief in which he raises three additional claims. Hurd contends that the first postconviction court did not address any of the issues raised in his first postconviction petition. In fact, that court held a hearing and issued an order addressing each of Hurd's 17 claims. Hurd also argues that the bloody pants introduced at trial were contaminated because the pants were improperly stored with Linnerooth's bloody clothes. But Hurd has not provided any evidence to support this claim

beyond his mere assertion, and we therefore decline to review it. *Brown v. State*, 286 Minn. 472, 475, 176 N.W.2d 605, 607 (1970) (holding that, on appeal from the postconviction court's denial of petitioner's claims, a claim not made to the postconviction court and lacking "any support in the record" amounted to a "mere argumentative assertion" that this court declines to review). Finally, Hurd's supplemental brief summarily states that all of the claims in this appeal bear on a claim of ineffective assistance of counsel. But we have said that counsel is not ineffective where counsel fails to raise meritless claims. *Schleicher v. State*, 718 N.W.2d 440, 448–49 (Minn.2006) ("Because appellate counsel's failure to raise meritless claims does not constitute deficient performance, [the defendants] claim of ineffective assistance of appellate counsel fails on the performance prong."). Because the claims forming the basis of Hurds ineffective assistance claim have no merit, we hold that Hurds counsel did not provide objectively unreasonable representation, and his ineffective assistance of counsel claim fails.