THISSEN, Justice.
Appellant Marcus Hallmark was found guilty by a Hennepin County jury of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2018), and second-degree intentional murder, *288 Minn. Stat. § 609.19, subd. 1(1) (2018), for killing Thomas Russ at a park-and-ride facility in Minnetonka. The district court convicted Hallmark on both charges and sentenced him to life without the possibility of release. On direct appeal, Hallmark raises, through his attorney, three claims of alleged reversible error. He first argues that the district court abused its discretion by admitting, under Minnesota Rule of Evidence 807, the prior recorded statement of an eyewitness. He also asserts that the district court abused its discretion by admitting, under Minnesota Rule of Evidence 403, evidence from a backpack found after Russ was murdered. Finally, Hallmark asserts that the district court erred by convicting him of both first-degree and second-degree murder in violation of Minn. Stat. § 609.04 (2018). Hallmark asserts several other claims of error in a supplemental pro se brief.
Because we hold that the district court did not abuse its discretion by admitting the challenged evidence, and because Hallmark's pro se claims lack merit, we affirm Hallmark's conviction for first-degree premeditated murder. But because the district court improperly entered a conviction on both first-degree and second-degree murder, we reverse Hallmark's conviction for second-degree intentional murder and remand this case to the district court to vacate that conviction.
FACTS
Late in the evening on March 3, 2017, Russ was shot and killed at a Metro Transit park-and-ride facility in Minnetonka. He was shot twice-once in the back of his head and once in the forehead from between a half inch and 2 feet away-and died at the scene.
In the days before the shooting, Hallmark's mother, A.M., loaned Hallmark her vehicle to use while she was at the hospital assisting her daughter. Because one of the tires on the vehicle went flat, Hallmark left it at the Minnetonka park-and-ride on March 2. The next evening, March 3, A.M. left the hospital and returned home where she learned about the flat tire and the location of her vehicle. Because her sister drove the same type of vehicle and had the same spare tire, A.M. borrowed her sister's vehicle to go fix the flat tire. A.M.'s sister, Hallmark, and Russ (the boyfriend of A.M.'s daughter) went along to help. No fights or disputes occurred on the drive to the park-and-ride.
A.M.'s sister drove her vehicle to the park-and-ride and parked a few spots away from A.M.'s vehicle inside the facility. A.M. did not see anyone else around at that time. A.M.'s sister, Hallmark, and Russ then left the vehicle and removed the spare tire from the trunk of A.M.'s sister's vehicle. A.M.'s sister then got back into the vehicle with A.M. Hallmark and Russ went over to A.M.'s vehicle to begin fixing the flat tire. According to A.M., Russ was doing most of the work fixing the tire, but Hallmark was helping by handing him tools. At no point were there any apparent issues or disputes between Hallmark and Russ.
After Hallmark and Russ began changing the tire, A.M. testified that she heard a "loud noise" that caused her to look over at the tire-changing process. She saw Russ lying on the ground with Hallmark crouched down between the two vehicles. Hallmark later ran from the scene.
A.M. and her sister left the park-and-ride and drove to nearby Ridgedale Mall. A.M. called 911. When asked by the 911 operator what happened at the park-and-ride, A.M. answered "My son shot 'em ... [a]nd he ran." Also during the 911 call she stated that "my son, and my sister came up to get my ... car-to fix a flat tire. My son ... pulled out a [expletive] gun and shot this [expletive] guy that ... we know *289 .... His name is ... [Russ] ... Oh my [expletive] God, I can't believe my son shot 'em." Additionally, A.M. was heard speaking to some other individual near her during the 911 call. She said, "Yes, officer, my son shot somebody and ran. Some guy in the Transit Center down there."[1]
Later, after police had arrived and escorted A.M. and her sister to the Minnetonka police station, A.M. gave a recorded statement to the police. She confirmed that while Hallmark and Russ were working on her vehicle at the park-and-ride, she "heard like this big loud noise like a boom or a pop or something and [she] thought the car or the jack fell on [Russ]." A.M. told police that, after hearing the noise, she looked over at Russ, who was lying on the ground on his back twitching. She stated:
And then all [of a] sudden Mark [Hallmark] just looked at me and gave me this look and I don't know that look, I've never seen that straight no smile no nothing, just these eyes just lookin' at me, not helping this man, laying there on the ground I didn't, kind of in a way I was scared you know because it's like why wouldn't my son help this guy ... then all of a sudden he, he shot him in [the] head right in the middle of the head while he was laying on his back.
A.M. described the second shot in detail. She said that Hallmark "bent down" and "put it ... right at his forehead ... just right up in the middle of the forehead and then he pulled the trigger, and that's when I knew, that's when I [saw] the black gun, that's when I knew what was going on ...." At the conclusion of her recorded statement, the police asked A.M. whether there was anything important that she had left out of her statement and whether the police had made any promises or threats to her in connection with giving her statement. She responded that she had told them everything and that they had not made any threats or promises to her regarding her statement. She also answered affirmatively when asked if everything she said was true, restated "to the best of [her] recollection." She was given the opportunity to read and sign the statement and fix any errors.
A.M.'s trial testimony differed from the 911 call and her recorded statement.[2] A.M. testified that she heard only one gunshot, which she initially thought was a problem with the car, and that she did not see a gun. She testified: "I just know [Hallmark] was c[r]ouched down ... I never heard, like I said, a second gunshot. I only heard one." When asked whether she recalled saying that she saw Hallmark place a black gun right in the middle of Russ's forehead and pull the trigger, A.M. responded by saying, "I don't recall saying that. I mean, no." Furthermore, during cross-examination by the defense, A.M. testified that she did not see who shot Russ, she was unsure of what the "loud noise" was, she did not know there were two shots, she "never saw a gun," and she "never saw [Hallmark] shoot a gun." She also testified that she was "assuming" when she told the 911 operator what happened because "everything was happening so fast and so quick, and everyone was scared." She further testified that she was in poor condition on the night of the murder because she had been up for three *290 days helping her daughter and was taking medication that made her "very, very drowsy." On redirect examination, the State confronted A.M. with her prior statements. She admitted making the statements, but testified that after a year of it "going over and over in [her] head" there is "a lot now that I'm able to see things and look at things straight and put everything into perspective. I didn't see no gun in my son's hand." The district court thereafter admitted A.M.'s recorded statement to police under the residual hearsay exception set forth in Minn. R. Evid. 807.
After the shooting, Hallmark fled the scene on foot. Following a coordinated effort, and with the assistance of a thermal camera affixed to a police helicopter, law enforcement located Hallmark in a marsh near the park-and-ride. Eventually, after being surrounded by police, Hallmark surrendered.
Numerous pieces of physical evidence were collected from the scene of the shooting as well as from the marsh near the park-and-ride. The morning after the shooting, police found a Ruger .380-caliber handgun as well as a small-caliber handgun holster in the marsh.[3] While processing the scene of the shooting at the park-and-ride, police recovered two spent .380 Federal Auto ammunition cartridge cases near Russ's body. Additionally, police found an open safe in the backseat of A.M.'s vehicle. The safe contained numerous types of ammunition, including Federal Auto .380-caliber ammunition. It also contained a Macanudo cigar case, a cardboard box for a Ruger LCP handgun, along with the owner's manual, and an empty Berretta-brand gun case. A total of 13 usable fingerprints were lifted from various locations on or in the vehicle. Police later executed a warrant for a DNA sample from Hallmark for comparison to any DNA evidence found.
The medical examiner testified at trial that Russ died from two gunshot wounds to the head. One shot entered the back of Russ's skull. The medical examiner could not determine the distance that bullet traveled. The other shot entered Russ's skull above his left eye, and, based on gunpowder burns on Russ's skin, traveled a distance from half an inch to about two feet. The medical examiner also recovered several bullet fragments from Russ's skull, which were passed on to the Hennepin County Crime Lab for further analysis.
A Hennepin County crime lab technician testified that the fingerprints found on a cigar box and a Winchester ammunition box in A.M.'s vehicle were matched to Hallmark. There were no usable prints on the recovered Ruger firearm or its magazine.
A firearms examiner also testified at trial. Her analysis focused on the two .380 Federal Auto cartridges recovered at the scene and the bullet fragments recovered from Russ's skull. She testified that both spent cartridges had been fired from the Ruger handgun recovered near the park-and-ride. The examiner also testified that at least two fragments recovered from Russ's skull had been fired by the same Ruger handgun.
A Hennepin County DNA analyst also testified. She concluded that the DNA profile obtained from the Ruger firearm "was a mixture of at least four individuals" but that "the profile of the major contributor matche[d] the DNA profile from Marcus Hallmark." The analyst noted that because four or more DNA contributors were present, *291 she had to seek special approval from a supervisor before she could interpret the DNA profile. Special approval is issued only when there is a "clear major DNA profile present." Because Hallmark's profile was a clear major profile, the approval was given by the lab's technical leader.
A major point of contention during the trial centered on the State's intended use of evidence from a backpack which was found after the murder and indirectly connected the Ruger handgun to Hallmark. In a discussion outside the presence of the jury, the State informed the district court that the Ruger firearm and the contents of the backpack were purportedly "stolen from a police officer." The recovered backpack contained "the police officer's badge ... [Hallmark's] identification [card], and a Ruger gunlock ... inside a humidor...." The humidor had Hallmark's fingerprints on its exterior surfaces. The State wanted to offer that evidence to link Hallmark to the Ruger firearm. The district court determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Minnesota Rule of Evidence 403.
The jury found Hallmark guilty of both first-degree premeditated murder and second-degree intentional murder. At the sentencing hearing, the district court stated that "[Hallmark would] be sentenced only on murder in the first degree," which carries a sentence of life without the possibility of release. However, Hallmark's sentencing order shows a disposition of "convicted" for both first-degree and second-degree murder. Hallmark appealed directly to our court.
ANALYSIS
Hallmark argues that the district court abused its discretion by admitting A.M.'s statement recorded at the police station under the residual hearsay exception contained in Minnesota Rule of Evidence 807 and by admitting the backpack evidence under Minnesota Rule of Evidence 403. He also asserts, through his attorney, that the district court erred by entering a conviction for both first-degree and second-degree murder. In a pro se supplemental brief, Hallmark raises several additional claims of error. We address each claim in turn.
I.
We first address Hallmark's claim that the district court abused its discretion by admitting A.M.'s recorded statement to police under Minnesota Rule of Evidence 807. "We review a district court's evidentiary rulings for an abuse of discretion." State v. Davis , 864 N.W.2d 171, 179 (Minn. 2015). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." State v. Guzman , 892 N.W.2d 801, 810 (Minn. 2017).
A.
Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). A hearsay statement "is not admissible except as provided" in the Minnesota Rules of Evidence or any other rules prescribed by our court or the Legislature. Minn. R. Evid. 802. There are several exemptions from and exceptions to the rule against hearsay. See, e.g. , Minn. R. Evid. 801(d)(1)-(2), 803 - 804. If a statement is not covered under a specific hearsay exemption or exception, it still may be admitted under the "residual exception" found in Minnesota Rule of Evidence 807. That rule states in relevant part:
*292 A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
Minn. R. Evid. 807.[4]
The decision to admit hearsay statements under Rule 807 has two steps. First, the district court must "look at the totality of the circumstances to determine whether [the] hearsay statement has 'circumstantial guarantees of trustworthiness.' " Davis , 864 N.W.2d at 181 (quoting State v. Robinson , 718 N.W.2d 400, 408 (Minn. 2006) ). Specifically, the district court must examine the circumstances actually surrounding the making of the statements. Id. (citing State v. Lanam , 459 N.W.2d 656, 661 (Minn. 1990) ). We have instructed district courts to evaluate, among other things,
whether the statement was given voluntarily, under oath, and subject to cross-examination and penalty of perjury; the declarant's relationship to the parties; the declarant's motivation to make the statement; the declarant's personal knowledge; whether the declarant ever recanted the statement; the existence of corroborating evidence; and the character of the declarant for truthfulness and honesty.
State v. Griffin , 834 N.W.2d 688, 693 (Minn. 2013) (quoting State v. Davis , 820 N.W.2d 525, 537 (Minn. 2012) ).
The totality of the circumstances test used to evaluate trustworthiness under Rule 807 requires a careful balancing of all relevant circumstances surrounding the making of the statement. For example, in Griffin , we upheld the admission of hearsay under Rule 807 where the statement at issue was "volunteered 'without suggesting or leading questions' ... [and] 'remained consistent throughout both of' the witness's 'versions of what happened' " and where "the witness 'had no motive to lie,' and the witness 'repeated consistent versions of her statement to two different [people] within a short period of time.' " Id . at 694-95 (quoting Robinson , 718 N.W.2d at 410 ). Additional circumstantial indicia of trustworthiness also attach to statements made based on a declarant's personal knowledge, especially where other evidence corroborates the statement. Id . at 695 ; see, e.g. , State v. Her , 750 N.W.2d 258, 276 (Minn. 2008) (concluding that voluntary, specific statements made based on first-hand personal knowledge and corroborated by other physical evidence possessed indicia of trustworthiness), judgment vacated on other grounds , 555 U.S. 1092, 129 S.Ct. 929, 173 L.Ed.2d 101 (2009) ; State v. Langley , 354 N.W.2d 389, 398 (Minn. 1984) (same), abrogated on other grounds , State v. Her , 781 N.W.2d 869 (Minn. 2010).
In State v. Ortlepp , we set out four other (albeit related) factors that, if present, contribute to the trustworthiness of a statement *293 under the residual hearsay exception. 363 N.W.2d 39, 44 (Minn. 1985). We have held that the district court does not abuse its discretion by admitting the statement as trustworthy when (1) there is no Confrontation Clause issue because the declarant testifies, admits to making the prior statement, and is available for cross-examination by the defense counsel; (2) the statement is recorded, removing any real dispute about what the declarant said; (3) the statement is against the declarant's penal interest; and (4) the statement is consistent with the State's other evidence that "pointed strongly toward" the defendant's guilt. Id. We have since clarified that the Ortlepp factors are not exclusive and merely represent "an application of the totality of the circumstances approach to satisfy the equivalent circumstantial guarantees of trustworthiness element of" the residual hearsay exception. Robinson , 718 N.W.2d at 408 ("[T]he proper analysis under the residual exception is to use the 'totality of the circumstances' approach, looking to all relevant factors bearing on trustworthiness." (citation omitted) (internal quotation marks omitted)).
Of course, other circumstances surrounding a statement may weaken the trustworthiness of the statement. A lack of trustworthiness may exist when the declarant has a strong motivation to bend the truth and implicate others. State v. Morales , 788 N.W.2d 737, 760 (Minn. 2010) (affirming a district court's ruling to not admit the recorded statements of a separately tried co-defendant under Rule 807 when the declarant had a strong motive to lie). Moreover, an extended gap in time between an event and a statement about the event detracts from a statement's trustworthiness. See State v. Hansen , 312 N.W.2d 96, 102 (Minn. 1981) (noting that a period of two weeks between an event and a statement about the event diminished trustworthiness), abrogation on other grounds recognized in State v. Bobadilla , 709 N.W.2d 243, 248 (Minn. 2006). Other factors that call into question the trustworthiness of a statement include making an unsworn statement during an investigation by state agents under circumstances that do not permit testing the statement via cross-examination, making a statement without first-hand knowledge, and making a statement in exchange for a financial reward. Id.
Although prior sworn statements-made under oath and subject to cross-examination-are generally more reliable than unsworn statements, we have noted that a totality of the circumstances approach should be used in evaluating the trustworthiness of the statement regardless of whether the statement was sworn or unsworn. See State v. Stallings , 478 N.W.2d 491, 495 (Minn. 1991). And while recantation of a prior statement may detract from trustworthiness, a recanted statement may nevertheless possess sufficient circumstantial guarantees of trustworthiness under the residual hearsay exception where (1) other uncontradicted evidence discredits the declarant's recantation; (2) the declarant possesses a motive to falsely recant; (3) the declarant's recantation is itself inconsistent; and (4) the prior hearsay statements are "strongly corroborated" by evidence admitted at trial. Robinson , 718 N.W.2d at 410.
The second step in evaluating a statement's admissibility under the residual hearsay exception requires the district court to determine whether the three enumerated requirements of Rule 807 are met. They require that (1) the statement is offered as evidence of a material fact; (2) the statement is "more probative on the point for which it [is] offered than any other evidence" procurable "through reasonable *294 efforts" by the proponent; and (3) the general purpose behind the Minnesota Rules of Evidence and the interests of justice are served by the admission of the statement into evidence. See Griffin , 834 N.W.2d at 693-94 (citing Minn. R. Evid. 807). We have held that the offered evidence need not be "essential" to satisfy the second requirement of the rule. State v. DeRosier , 695 N.W.2d 97, 106 (Minn. 2005). Rather, the rule requires that the district court consider whether other admissible evidence on the same point could be obtained through reasonable efforts. Id. And we have noted that the Minnesota Rules of Evidence should be construed to secure fairness and "to promote the growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." State v. Aubid , 591 N.W.2d 472, 479 (Minn. 1999) (quoting Minn. R. Evid. 102 ).
Overall, evaluating the admissibility of a statement under Rule 807 requires a district court to carefully balance all of the relevant circumstances surrounding the making of the statement at issue, while also considering each of the three prongs set forth within the language of the rule. With these principles in mind, we turn to Hallmark's claim.
B.
The district court admitted A.M.'s recorded statement to police after A.M. had already testified, relying almost entirely on Ortlepp . The court found that A.M.'s recorded statement had sufficient guarantees of trustworthiness because A.M. "admitted making the prior statement[ ]," the statement "was made close in time to the events, which goes to its reliability," the statement was "against interest in the sense that [it] implicated her son in the commission of a crime," the statement was "corroborated by the 911 call from the same witness; by physical evidence at the scene; and by other evidence in the case that I understand is coming in ... such as the defendant's DNA on the gun [and] the matching of the ballistics to the gun ...." The court therefore concluded, without discussing the three prongs of Rule 807 itself, that A.M.'s prior statement to police was admissible as substantive evidence.[5]
Hallmark takes issue with the district court's apparent failure to evaluate more than just the Ortlepp factors. He asserts that other factors should have been evaluated under the totality of the circumstances test. We agree that the court appears to have based its holding almost entirely on the Ortlepp factors, which we have previously identified as a nonexhaustive list of considerations relevant to Rule 807. See Robinson , 718 N.W.2d at 409. We agree that the district court should have explicitly considered all relevant factors showing circumstantial guarantees of trustworthiness and addressed each of the three prongs of Rule 807.
Nonetheless, the court's failure to explicitly consider all relevant circumstances under Rule 807 is not automatically an abuse of discretion. In the past, when a district court has failed to consider "any other relevant factors bearing on trustworthiness," we have independently evaluated whether the statement at issue is admissible under Rule 807. See, e.g. , id. (noting that where "the facts relevant to trustworthiness are undisputed and the applicability of the residual [hearsay] exception arises in the context of a harmless error *295 analysis, it is appropriate for us to determine admissibility of the statements"). We do so here as well.
The totality of the circumstances surrounding A.M.'s statement shows that A.M.'s statement possessed sufficient circumstantial guarantees of trustworthiness and meets the three requirements of Rule 807. A.M. gave her statement voluntarily to the police in response to open-ended questions. There is no evidence of coercion. Her statement, based on her first-hand knowledge, was specific and detailed. A.M. described her son pausing after an initial loud "boom," then walking over to Russ, who was already lying on the ground, leaning down, and shooting him in the forehead. The statement was recorded so its contents are not at issue. Indeed, A.M. admitted at trial to making the statement. The statement also closely mirrors what A.M. said in her 911 call which she made on the same night. Moreover, A.M.'s statement directly implicated her son in premeditated murder.[6] Nothing in the record suggests that A.M. had any ulterior motive or any motivation to bend the truth and implicate others through her statement.[7] Morales , 788 N.W.2d at 760.
Physical evidence also corroborates A.M.'s statements. Hallmark's fingerprints were found on both the cigar box and Winchester .380 ammunition box located inside A.M.'s vehicle, showing that Hallmark had access to the caliber of ammunition required to fire the Ruger handgun. Hallmark was also identified as the major contributor of DNA on the black Ruger .380-caliber handgun used to kill Russ. The medical examiner's description of one of the gunshot wounds matches A.M.'s description in her recorded statement of *296 Hallmark bending down and shooting Russ in the forehead: one bullet entered Russ's skull above his left eye and was fired from anywhere between half an inch to about two feet away. Moreover, A.M.'s statement that Hallmark fled on foot after he shot Russ is consistent with the testimony establishing that Hallmark was eventually arrested in the marsh near the park-and-ride, which is also where the Ruger handgun used to kill Russ was found.
There are considerations that weigh against a finding of trustworthiness. A.M.'s statement was made at 2:40 a.m. after a 45-minute informal conversation with detectives. A.M. also had not slept for three nights and was taking drowsiness-inducing medication. Moreover, A.M. partially recanted her statement at trial. Her statement to police was not formally under oath and was not subject to cross-examination at the time it was made. The State also failed to present any evidence related to A.M.'s character for truthfulness. None of these facts are dispositive but rather are to be balanced against other facts in a totality of the circumstances approach. Stallings , 478 N.W.2d at 495.
The circumstances to which Hallmark points to establish a lack of trustworthiness are not clear-cut. While A.M.'s statement was made at 2:40 a.m., her statement was voluntary and the detectives interviewing A.M. used almost entirely open-ended questions throughout the interview. The detective who took A.M.'s statement testified at trial that although A.M. was tired and upset during the interview, she was a willing participant and never once expressed any confusion or uncertainty over the fact that she saw her son, Hallmark, shoot Russ. Cf. Oliver v. State , 502 N.W.2d 775, 778 (Minn. 1993) (noting that testimony by police that a declarant did not appear to be under the influence of any drugs when declarant made his statement refuted any claim of confusion by the declarant). Moreover, at the conclusion of A.M.'s statement, she was given an opportunity to share anything else she wanted to include in her statement. She confirmed that her statement was true and made of her own free will to the best of her recollection. A.M. was also vigorously cross-examined at trial under oath about the shooting and the statement.
Hallmark also argues that the 45-minute "informal" conversation that occurred between police officers and A.M. before taking A.M.'s formal statement raises questions about the trustworthiness of A.M.'s statement. Hallmark points out that, during the informal conversation, police officers shared information that they had learned about the shooting with A.M. In particular, the police told A.M. that Russ had been shot twice in the head. Hallmark argues that the police sufficiently shaped A.M.'s recollection of events during the informal conversation so as to call into question the trustworthiness of her formal, recorded, statement.
We acknowledge the possibility that a preliminary informal discussion with police officers could influence a witness's later formal statement.[8] In this case, however, such influence is mere speculation. The only part of A.M.'s statement that the trial evidence suggests may have been shaped by the informal conversation is the fact of a second shot, and even that is speculation. Hallmark did not raise questions about undue influence during his cross-examination of the police officer who had the informal conversation with A.M. Indeed, A.M.'s *297 formal statement includes several specific facts and descriptions that only A.M. could have known. In particular, A.M. recounted her son's prolonged moment of eye contact with her and described in detail the location of the second shot in Russ's forehead and that Hallmark shot from close range. Nothing in the record suggests that the police shared those details with her. Ultimately, Hallmark's speculation about the impact of the informal statement is not decisive under the totality of the circumstances analysis.
A.M.'s trial recantation does little to undermine the trustworthiness of her recorded statement. If anything, her recantation is itself suspect. The fingerprint, DNA, and firearm evidence adduced at trial contradicts A.M.'s recantation but lends support to her statement to police. Further, A.M. possessed a motive to falsely recant: to prevent her son from going to prison for the rest of his life. She testified at trial that she loved her son. Under the circumstances, A.M.'s recantation at trial-and not her prior recorded statement to police-is the statement lacking trustworthiness.
Finally, A.M.'s statement also satisfies the requirements of Rule 807. First, the statement was "offered as evidence of a material fact." The statement was direct eyewitness testimony establishing the premeditation element of first-degree murder. A.M.'s statement demonstrated that Hallmark paused for a moment before shooting Russ, which demonstrates a conscious moment of reflection and a decision to kill. See State v. Cox , 884 N.W.2d 400, 413 (Minn. 2016) ("[W]e have concluded that evidence of even a short pause between shots may support an inference of premeditation.") Second, A.M.'s statement was more probative in establishing premeditation than any other piece of evidence admitted or reasonably procurable. She witnessed the murder firsthand and recounted the nature of the killing in explicit detail. Her recorded statement proves the State's case-and, in particular, proof of premeditation-far more effectively than any inferences drawn from circumstantial evidence gathered from the scene. See DeRosier , 695 N.W.2d at 106 (noting that evidence offered under Rule 807 need not be "essential," although if "other admissible evidence" showing the same thing could be obtained, that other evidence is presumably preferable). Finally, the admission of a voluntary statement recounting Russ's murder in explicit detail, made without coercion by Hallmark's own mother and directly implicating Hallmark in the killing, promotes the "growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Aubid , 591 N.W.2d at 479 (quoting Minn. R. Evid. 102).
In sum, although the district court did not explicitly evaluate every aspect of Rule 807, the record establishes that the district court did not make its decision "based on an erroneous view of the law or ... against logic and the facts in the record." Guzman , 892 N.W.2d at 810. Consequently, we hold that the district court did not abuse its discretion by admitting A.M.'s recorded statement under Minnesota Rule of Evidence 807.
II.
We next address Hallmark's claim that the district court erred by admitting evidence about the contents of a backpack found after Russ was murdered. "We review a district court's evidentiary rulings for an abuse of discretion." Davis , 864 N.W.2d at 179-80.
A.
Before trial, the State moved in limine to have "evidence of a burglary that occurred *298 in Farmington" admitted at Hallmark's trial. Russ was killed on March 3, and the Farmington burglary occurred on March 1 or 2. A Ruger .380 handgun with the same serial number as the weapon used to kill Russ was stolen along with a Ruger gunlock, a police badge, and a gun safe (the same safe later found in the vehicle Hallmark left at the park-and-ride). Some of the stolen items were found in a backpack on March 4 near Isanti. The backpack also held Hallmark's identification, and Hallmark's fingerprints were on items in the backpack. The State argued that this evidence connected Hallmark to the Ruger handgun used to shoot Russ.
After Hallmark disputed that he had access to the murder weapon at the time of the murder, the district court allowed the State to offer carefully limited testimony that established that a child's backpack was found on March 4, 2017 in Isanti County. Testimony further established that inside the backpack was a cigar humidor containing Hallmark's state identification card, a Ruger gunlock, and several items belonging to a person who owned a Ruger .380-caliber handgun that had gone missing on March 1 or 2, 2017, including an employment identification card. A fingerprint analyst testified that two prints pulled from the items within the humidor matched Hallmark's fingerprints. Finally, evidence was introduced showing that the Ruger .380-caliber handgun that had been reported missing with the items found in the backpack had the same serial number as the Ruger .380 handgun recovered from the marsh near the park-and-ride. The State made no reference to a purported burglary.
B.
Hallmark asserts that the district court erred by admitting evidence about the backpack because its probative value was substantially outweighed by the danger of unfair prejudice and misleading the jury. Specifically, he asserts that the evidence created an inference that Hallmark had committed a burglary for which he was not charged.
Only relevant evidence is admissible at trial. See Minn. R. Evid. 402. Evidence is "relevant" when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Rule 401 reflects a "minimal relevancy approach," and "[r]ulings on the 'relevancy of evidence are generally left to the sound discretion of the trial court.' " State v. Ture , 632 N.W.2d 621, 631 (Minn. 2001) (quoting State v. Horning , 535 N.W.2d 296, 298 (Minn. 1995) ).
Objects connected to the crime scene or the investigation are relevant at trial even when they are not directly tied to the defendant. State v. Zornes , 831 N.W.2d 609, 624 (Minn. 2013) ("[T]he fact that the objects are not directly tied to a defendant only affects the weight of the evidence."). Moreover, testimony that a defendant had prior access to a handgun that matches the description of the weapon used in a murder is generally relevant. See State v. Williams , 418 N.W.2d 163, 168-69 (Minn. 1988) (concluding that testimony showing a defendant owned a .22-caliber firearm was relevant where the murder had been committed with an unrecovered .22-caliber firearm).
Even if evidence is relevant, it may nevertheless be excluded from trial "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues ... misleading the jury, or ... needless presentation of cumulative evidence." Minn. R. Evid. 403.
*299 "We have explained that the term 'prejudice' in Rule 403 'does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.' " State v. Mosley , 853 N.W.2d 789, 797 (Minn. 2014) (quoting State v. Cermak , 365 N.W.2d 243, 247 n.2 (Minn. 1985) ). Consequently, if relevant evidence has the effect of persuading the jury through illegitimate means, it must be excluded from trial.
We conclude that the district court did not abuse its discretion by finding that the backpack evidence was relevant. The evidence established that a Ruger .380-caliber handgun, along with several other items belonging to the owner of the handgun (including the owner's employment identification), had been reported missing on March 2, 2017. The missing Ruger handgun had the same serial number as the Ruger handgun with Hallmark's DNA on it which was recovered in the marsh near the park-and-ride on the night of Russ's murder. That same handgun was used to shoot Russ. On March 4, 2017, a backpack containing Hallmark's state identification card and other items taken along with the handgun, including the gun owner's employment identification card, a Ruger gunlock, and a humidor, were found in Isanti County. Hallmark's fingerprints were found on the humidor. Put succinctly, the evidence found in the backpack connects Hallmark to the Ruger handgun by establishing that Hallmark had access to items that went missing along with the handgun and that his access to those items could have occurred at most only a few nights before the shooting.[9] Under Rule 401 's "minimal" relevance requirements, and in light of the connection between Hallmark, the Ruger handgun, and the items found in the backpack, the district court did not abuse its discretion by finding the backpack evidence relevant.
We also conclude that the district court did not abuse its discretion by admitting the evidence over Hallmark's objection that its probative value was substantially outweighed by its potential prejudicial effect. No testimony was presented at trial showing whether the handgun or the items in the backpack were stolen or simply misplaced and lost by the gun owner. The word "burglary" was never used at trial and no witness described any details of an uncharged burglary. We have carefully reviewed the trial testimony related to the backpack evidence. We will not make the speculative leap that the jury that heard this carefully limited testimony assumed that Hallmark participated in an uncharged burglary.
Accordingly, we conclude that the district court did not abuse its discretion by finding that the probative value of the backpack evidence connecting the handgun to Hallmark outweighed a speculative prejudicial effect that Hallmark also participated in a burglary.
III.
We next address Hallmark's claim that the district court erred by entering a *300 conviction for both first-degree and second-degree murder where second-degree murder is a lesser-included offense of first-degree murder. The State concedes that the district court committed error in this respect. We agree.
Under Minnesota law, a defendant "may be convicted of either the crime charged or an included offense, but not both." Minn. Stat. § 609.04, subd. 1. "[A] lesser degree of the same crime" constitutes an "included offense." Id. , subd. 1(1). It is well-settled in Minnesota that second-degree murder is a lesser degree of first-degree murder. Spann v. State , 740 N.W.2d 570, 573-74 (Minn. 2007). Therefore, when a defendant is found guilty of both first-degree and second-degree murder, he may be convicted of only one or the other, but not both.
Because Hallmark could not be convicted of both first-degree and second-degree murder, the district court erred by entering both convictions. See State v. Pflepsen , 590 N.W.2d 759, 766 (Minn. 1999). We therefore reverse Hallmark's conviction for second-degree intentional murder and remand to the district court with instructions to vacate that conviction. The jury verdict finding Hallmark guilty of second-degree intentional murder, however, remains intact. See State v. Earl , 702 N.W.2d 711, 724 (Minn. 2005) ("[J]ury verdicts on [vacated] counts remain in force.").
IV.
Hallmark also filed a supplemental brief raising several other claims. Generally, Hallmark's supplemental claims can be grouped into three categories: (1) claims that the district court abused its discretion; (2) claims that his trial counsel was ineffective; and (3) claims of prosecutorial misconduct. We address each claim in turn.
A.
Hallmark raises 12 "abuse of discretion" claims that he asserts entitle him to a new trial. We conclude that none of his claims have merit.
1.
Hallmark first argues that the district court abused its discretion by not ordering a change of venue because there was "significant media" attention on his case and he was prejudiced because the media "slandered" his name and linked him to other crimes. Hallmark never moved for a change of venue. Further, he offers no evidence of negative publicity, much less any evidence suggesting he was actually prejudiced by the purportedly negative media coverage, both of which are prerequisites to granting relief. See State v. Everett , 472 N.W.2d 864, 866 (Minn. 1991). Consequently, this claim lacks merit.
2.
Hallmark next argues that his right to an impartial jury was inhibited when the district court improperly impaneled jurors who had prior knowledge of the case through the internet, newspapers, and television media. This claim also lacks merit. To succeed on this claim, Hallmark must demonstrate that at least one juror was "actually biased" against him, which means he must show that at least one juror had "strong and deep impressions" of the case that she could not set aside and which would "prevent[ ] her from rendering a verdict based on the evidence presented in court." State v. Curtis , 905 N.W.2d 609, 614-15 (Minn. 2018). However, Hallmark points to no specific juror with any purported "actual bias." Numerous potential jurors were excused after it became clear during voir dire that they might have had prior knowledge of Hallmark's *301 case. But no jurors impaneled for Hallmark's trial exhibited any prior knowledge of the case, much less "strong and deep impressions" of the case.
3.
Hallmark argues that because there was no evidence of motive he was convicted in error. Essentially, Hallmark challenges the sufficiency of the evidence underlying his convictions. See State v. McArthur , 730 N.W.2d 44, 49 (Minn. 2007) (treating a claim that there was no evidence of motive as a form of a "sufficiency" claim). We review a sufficiency of the evidence claim by conducting "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." State v. Hurd , 763 N.W.2d 17, 26 (Minn. 2009). In doing so, we give "[c]ircumstantial evidence ... the same weight as all other evidence" and "assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary." Id. (internal citations omitted) (internal quotation marks omitted).
Hallmark's claim lacks merit. "Proof of motive is not necessary to find premeditated murder, but it can help strengthen a finding that the defendant deliberated about the killing." State v. Anderson , 789 N.W.2d 227, 242 (Minn. 2010) (citing State v. Griese , 565 N.W.2d 419, 429 (Minn. 1997) ). Moreover, our painstaking review of the record demonstrates that there was sufficient evidence from which a jury could reasonably convict Hallmark.
4.
Hallmark argues that he was prejudiced because one of the jurors at his trial fell asleep during testimony. To succeed on a claim of juror misconduct, Hallmark must show "actual misconduct" by a specific juror and prejudice resulting from the misconduct. See State v. Peterson , 262 N.W.2d 706, 707 (Minn. 1978) ; see also State v. Danielson , 276 Minn. 428, 150 N.W.2d 567, 568 (Minn. 1967) (noting that there was no "showing of prejudice" where a juror appeared to be sleeping at trial, but was in fact "simply bowing his head").
Although the record suggests that one of the jurors in Hallmark's trial fell asleep during testimony, Hallmark suffered no prejudice as a result. On the third day of trial, the district court noted that juror 14 had been "dozing off" during testimony. However, the court also noted that juror 14 was an alternate juror and would presumably not be needed for deliberations. Following closing arguments and jury instructions, the court dismissed the two alternate jurors. As a result, juror 14 did not deliberate in Hallmark's case. There is no evidence that the juror's mid-trial slumber prejudiced Hallmark. Thus, this claim fails.
5.
Hallmark next argues that his indictment for first-degree murder was defective because the "crime was not premeditated" and the indictment as written was "vague." The district court denied Hallmark's pretrial motion to dismiss his indictment.
A presumption of regularity attaches to a grand jury indictment, which will be invalidated only in a rare case. State v. Inthavong , 402 N.W.2d 799, 801 (Minn. 1987). "A criminal defendant bears a heavy burden when seeking to overturn an indictment. The burden is heavier for a defendant who raises the issue on direct appeal after he has received a fair trial and been found guilty beyond a reasonable doubt."
*302 State v. Smith , 876 N.W.2d 310, 322 (Minn. 2016) (quoting Dobbins v. State , 788 N.W.2d 719, 731 (Minn. 2010) ).
We reject this claim for two reasons. First, we disagree with Hallmark's contention that the indictment was vague. An indictment need only contain (among other requirements) "a written statement of the essential facts constituting the offense charged" and "[f]or each count, ... cit[ation to] the statute, rule, regulation, or other provision of law the defendant allegedly violated." Minn. R. Crim. P. 17.02, subds. 2-3. We have upheld indictment language for first-degree premeditated murder where the indictment alleged only the day, month, and year of the murder, the location of the murder, the accused's name, the victim's name, and the elements of the crime. State v. Bias , 419 N.W.2d 480, 486 (Minn. 1988) (noting that the indictment touched on "the essential elements of ... [the] crime[ ] charged" and that "no greater particularity is needed if all that is essential to constitute the offense is stated fully and directly"). In this case, the indictment contained for each count the name of the charged crime, the statute under which it was charged, the date of the offense, a statement of the offense level (i.e. felony), the anticipated penalty for the crime, and a short description charging Hallmark with causing the death of Russ under the requisite elements of both first- and second-degree murder. We upheld essentially identical language in Bias . See 419 N.W.2d at 486.
Second, to the extent Hallmark challenges the indictment because the element of premeditation for the first-degree murder charge was based on A.M.'s recorded statement, his claim fails. We have already held that A.M.'s statement was admissible under Minn. R. Evid. 807. Further, while "[a]n indictment must be based upon admissible evidence," the presentation of inadmissible evidence to the grand jury does not require dismissal of an indictment so long as "there is sufficient evidence to sustain the indictment" and the defendant does not demonstrate that "incompetent evidence has so far influenced the grand jury that an indictment would not have been returned without it." State v. Roan , 532 N.W.2d 563, 570 (Minn. 1995) (citation omitted) (internal quotation marks omitted). The evidence offered at the grand jury hearing was more than enough to "establish[ ] probable cause to believe an offense has been committed and the defendant committed it." Minn. R. Crim. P. 18.05, subd. 2. The grand jury heard testimony showing that Hallmark brought a gun to the park-and-ride, shot Russ twice in the head, and that the shots were precise and exacting. Such evidence established probable cause to believe that Hallmark premeditated the murder of Russ. See State v. Goodloe , 718 N.W.2d 413, 422 (Minn. 2006) (requiring only "a short period of time" for premeditation); see also State v. Galvan , 912 N.W.2d 663, 671 (Minn. 2018) (noting that two close-range gunshots to the head constituted "execution-style" killing and supported a finding of premeditation); State v. Clark , 739 N.W.2d 412, 422-23 (Minn. 2007) (bringing murder weapon to the scene showed planning evidence that supported premeditation).
6.
Hallmark next asserts that the district court erred by admitting evidence of "special testing" on the Ruger .380-caliber handgun for DNA and fingerprints. Specifically, Hallmark argues that the DNA analyst performed "special testing" by analyzing the DNA profile on the handgun even though internal crime lab procedures purportedly prohibited further analysis where four or more people's DNA is present.
*303 We find no error here because Hallmark misstates the trial testimony. The DNA analyst testified that the Hennepin County Crime Lab prohibits interpreting the DNA profile on a piece of evidence where there are four or more contributors of DNA unless and until the analyst obtains special approval from the analyst's supervisor to interpret the profile. That approval is provided only when "there's a clear major DNA profile present," in which case the analyst can "then ... interpret[ ] that major DNA profile." Because the DNA evidence contained a major profile-namely, a profile matching Hallmark's DNA-permission was granted to analyze it. The DNA analyst followed proper protocol. Therefore, Hallmark was not held to a different standard of evidence by the DNA analyst's testing procedures and his claim to the contrary fails.
7.
Hallmark argues that the district court abused its discretion by improperly admitting several bullet fragments removed from Russ's skull because the medical examiner who testified about them could only say that the fragments looked similar to the fragments he removed from the victim. Hallmark asserts that this error prejudiced him by increasing the premeditation evidence available to the jury.
The admissibility of evidence subject to a chain of custody is "generally 'left to the sound discretion of the trial judge.' " State v. Hager , 325 N.W.2d 43, 44 (Minn. 1982) (quoting State v. Johnson , 307 Minn. 501, 239 N.W.2d 239, 242 (1976) ). There is no "rigid formulation of what showing is necessary in order for a particular item of evidence to be admissible" where chain of custody is suspect. Id . Evidence subject to a chain of custody is admissible when there is a "reasonabl[e] probab[ility] that tampering or substitution did not occur," see id. , and the evidence is what the proponent claims, see Minn. R. Evid. 901(a) ; see also State v. Bailey , 677 N.W.2d 380, 394 (Minn. 2004). Any speculation about tampering "may well affect the weight of the evidence ... but does not affect its admissibility." Hager , 325 N.W.2d at 44.
After removing the bullet fragments from Russ's skull, the medical examiner placed those fragments and other evidence recovered during the autopsy into three envelopes for later identification. The chain of custody is typically demonstrated at trial by having the medical examiner identify his or her signature on an envelope. At Hallmark's trial, however, it was discovered that the medical examiner's signature on one of the three envelopes containing the bullet fragments did not transfer cleanly for later recognition. Consequently, the medical examiner could only testify that the bullet fragments contained within that envelope had "a similar appearance" to the fragments he removed from Russ's skull. When the State attempted to offer the fragments, Hallmark objected that the evidence lacked proper foundation. The State laid additional foundation by having the medical examiner confirm that three envelopes were involved in the collection of bullet fragments from Russ's skull and that two envelopes he was shown at trial included his name, the date of the autopsy, the name of the deceased, and his signature. Only the third envelope exhibited faded writing and could not be read clearly. The medical examiner also confirmed that he performed only one autopsy on March 5, 2017-the autopsy of Russ.
The district court also questioned the medical examiner outside the presence of the jury. The medical examiner confirmed that he placed the bullet fragments in the envelopes and sealed them. He testified *304 that he had no knowledge of any contamination of the evidence and that his only issue with the envelope was that the writing that he would normally recognize failed to transfer cleanly onto the envelope. After this testimony, the court admitted the evidence over Hallmark's objection, stating, "I don't see [that] there's any other explanation [for the source of the bullet fragments]. He did one autopsy on this date ... it goes to weight not admissibility."
We conclude that the district court did not abuse its discretion by admitting the bullet fragments. The medical examiner confirmed that the only reason he could not definitively testify that the envelope contained bullet fragments from Russ was that his signature did not cleanly transfer onto the envelope's surface. Moreover, the court verified that the medical examiner performed only one autopsy on the date listed on the envelope-the autopsy of Russ-and that every other aspect of the chain of custody was correct. Under the deferential review we afford the district court in evaluating foundation, it was "reasonably probable that tampering or substitution did not occur" to the bullet fragments. Hager , 325 N.W.2d at 44.
8.
Hallmark argues that the district court erred by referencing A.M.'s statements in one instruction. The instruction stated:
Evidence of any prior inconsistent statement or conduct should be considered only to test the believability and weight of the witness's testimony at trial. In the case of [A.M.], however, evidence of her statements made on the 911 call and to detective [J.W.] on March 4th, 2017, may be considered by you for all purposes.
We review a district court's jury instructions for an abuse of discretion. State v. Huber , 877 N.W.2d 519, 522 (Minn. 2016). A "district court enjoys considerable latitude in selecting jury instructions and the language of those instructions" such that a court does not abuse its discretion so long as the instructions "fairly and adequately explain the law of the case and [do] not materially misstate the law." Id. (internal citations omitted).
The instruction to which Hallmark objects is a modified version of CRIMJIG 3.15 related to witnesses' prior inconsistent statements. See 10 Minn. Dist. Judges Ass'n, Minnesota Practice-Jury Instruction Guides, Criminal , CRIMJIG 3.15 (6th ed. 2018).[10] The district court modified CRIMJIG 3.15 to conform to its ruling (which we have affirmed) that A.M.'s 911 call and recorded statement to police were admissible as substantive evidence that could be considered for all purposes. Before giving the instruction, the court noted that "frankly, [the modified instruction] actually does not emphasize [A.M.'s statement] as much as it would if it had [its] own separate instruction."
A.M.'s recorded statement to police was admissible under Rule 807 and the district court's instruction did nothing more than "fairly and adequately explain the law of the case" as applied to A.M.'s statements. Thus, the district court did not abuse its discretion by giving this instruction. See Huber , 877 N.W.2d at 522.
*305 9.
Hallmark further contends that the district court erred by admitting prejudicial testimony from expert witnesses. However, he does not identify which experts and what statements were prejudicial. Consequently, this claim is deemed waived. See State v. Palmer , 803 N.W.2d 727, 741 (concluding that claims made without argument or citation are waived).
10.
Hallmark also argues that the district court erred by admitting numerous photographs of the victim where one would have been sufficient. He claims that the photos were unduly prejudicial and cumulative. We review the admission of photos of the victim for an abuse of discretion. Hurd , 763 N.W.2d at 30. And because Hallmark never objected to this purported error at trial, our review is for plain error. See State v. Ramey , 721 N.W.2d 294, 302 (Minn. 2006).
We find no plain error here. We have previously held that "it [i]s not error to admit gruesome pictures of the victim's body where the pictures have not been shown to be distorted or to inaccurately portray the subject matter" because even " 'horrible, revolting, and ghastly' " depictions of the victim may be an " 'inherent and inseparable part of the facts which were relevant to a full consideration of material issues by the jury.' " Hurd , 763 N.W.2d at 30 (quoting State v. DeZeler , 230 Minn. 39, 41 N.W.2d 313, 318 (1950) ). Moreover, where the photos are used to illustrate a medical examiner's testimony or to corroborate eyewitness testimony, they have substantial probative-as opposed to unduly prejudicial-value. Dunn v. State , 486 N.W.2d 428, 433 (Minn. 1992).
Thirteen photos showing Russ's body at the scene of the crime at the park-and-ride were admitted to explain how the police collected evidence from the scene. Nine photos (including an x-ray) showing Russ's body undergoing an autopsy were admitted to illustrate the various stages of analysis that the medical examiner went through in determining Russ's cause of death. Hallmark does not dispute that the photos served the purpose of explaining the police investigation and examination by the medical examiner. All of the photos of the victim that were introduced constituted an "inherent and inseparable part of the facts which were relevant to a full consideration of material issues by the jury." Hurd , 763 N.W.2d at 30. Therefore, we conclude that the photos were not unduly prejudicial or cumulative and the district court did not plainly err by admitting them.
11.
Hallmark argues that the district court erred by not ordering a Rule 20 competency exam, see Minn. R. Crim. P. 20.01, because the brutal nature of the crime with which he had been charged suggested the need for a mental examination. He did not request a Rule 20 examination before the district court.
"A defendant has a due process right not to be tried [and] convicted of a criminal charge if he or she is legally incompetent." Bonga v. State , 797 N.W.2d 712, 718 (Minn. 2011) (citing Drope v. Missouri , 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) ). "[A] defendant is competent to stand trial in a criminal matter [when] he or she 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'has a rational as well as factual understanding of the proceedings against him.' " Id. (quoting Dusky v. United States , 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)); see Minn. R. Crim. P. 20.01, subd. 2. Under *306 Rule 20.01, if at any time the prosecutor, defense counsel, or the district court "doubts the defendant's competency, the prosecutor or defense counsel must make a motion challenging competency, or the court on its initiative must raise the issue." Id. , subd. 3.
We have never held that the nature of a charged crime by itself requires a district court to order a Rule 20 competency examination on its own initiative. Moreover, even when the charged crime is particularly atrocious-and seemingly devoid of explanation-the question of competency turns not on the nature of the crime but on whether the defendant can sufficiently consult with counsel "with a reasonable degree of rational understanding" and whether he has a "rational as well as factual understanding" of the legal process he faces. Bonga , 797 N.W.2d at 718.[11] Unless "the aggregate of the evidence" in the record "create[s] a sufficient doubt of the defendant's competence," we will not find error in a district court's failure to order a Rule 20 evaluation. Id. at 719 (noting that a suicide attempt during trial was relevant with respect to competence).
Hallmark points to no evidence suggesting that he lacked the ability to consult with his lawyer or that he lacked the ability to rationally and factually understand the proceedings against him. He points only to the brutality of his crime. Moreover, our review of the record confirms that Hallmark possessed the ability to consult with his lawyer and that he understood the proceedings against him. In fact, during his trial, Hallmark actively worked with defense counsel on a strategic tactical decision to challenge DNA evidence in light of the district court's related rulings. Absent any evidence showing that Hallmark was incompetent, the district court did not err by not ordering a Rule 20 exam.
12.
Hallmark argues that his sentence of life without the possibility of release was improper under Minn. Stat. § 611.02 (2018) because the district court could have sentenced him on the second-degree murder conviction. Hallmark also argues that the failure of the prosecution to offer a plea bargain was an error requiring reversal.
Each claim lacks merit. First, Hallmark misstates the nature of Minn. Stat. § 611.02. That statute reads:
Every defendant in a criminal action is presumed innocent until the contrary is proved ... when an offense has been proved against the defendant, and there exists a reasonable doubt as to which of two or more degrees the defendant is guilty, the defendant shall be convicted only of the lowest.
Id. We have stated that section 611.02 does not require a defendant found guilty of two crimes to be sentenced on the lesser of the two crimes. See, e.g. , State v. Leinweber , 303 Minn. 414, 228 N.W.2d 120, 125 (1975) (discussing Minn. Stat. § 611.02 in the context of charging the jury). We have also declined to reduce a first-degree murder conviction supported by sufficient evidence to a second-degree murder conviction under this statute. See State v. Young , 710 N.W.2d 272, 279 n.1 (Minn. 2006). There is sufficient evidence to support the jury's *307 verdict that Hallmark committed first-degree murder beyond a reasonable doubt.
Second, we have stated that a prosecutor "has no duty to initiate plea bargaining, and ... has no duty to make a bargain." State v. Andrews , 282 Minn. 386, 165 N.W.2d 528, 532 n.4 (1969) ; see Wheeler v. State , 909 N.W.2d 558, 564 (Minn. 2018) (noting that "plea bargain[ing]" is "a discretionary function [of prosecutors], not an obligation"). Consequently, the fact that Hallmark was not offered a plea bargain provides no legal basis for reversal.
B.
Hallmark also contends that he received ineffective assistance of counsel. To prevail on this claim, Hallmark must show that " '(1) his counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability that the outcome would have been different but for counsel's errors.' " State v. Manley , 664 N.W.2d 275, 289 (Minn. 2003) (quoting State v. Ture , 632 N.W.2d 621, 632 (Minn. 2001) ).
Hallmark argues that his attorney failed to conform to a reasonable-counsel standard in numerous ways. Specifically, Hallmark points to his trial attorney's apparent failure:
• To seek a Rule 20 competency hearing and demand a speedy trial.
• To seek court-ordered expert witnesses whose testimony would help Hallmark, and to hire a competent investigator.
• To proactively seek a plea bargain or demand a change of venue.
• To request "certain jury instructions," object to the instruction regarding A.M.'s statement, and object to instructions that purportedly shifted the burden of proof from the State to Hallmark.
• To object to prejudicial opening and closing statements.
• To use peremptory strikes during voir dire properly.
• To object to "evidence, custody issues, [and] pretrial motions" where counsel "just went along with [it.]"
• To object to an indictment that placed the burden of proof on Hallmark.
• To object to a juror falling asleep during testimony.
• To not test Hallmark's clothing and hands for gunshot residue and blood.
• To not show video evidence to the jury that purportedly established that Hallmark was never at the crime scene, and other people were.
• To argue at sentencing that Hallmark should be sentenced for second-degree murder instead of first-degree murder.
• To effectively cross-examine witnesses.
Hallmark fails, however, to point to anything in the record supporting these allegations. Moreover, our review of the record satisfies us that Hallmark was not denied effective assistance of counsel. Therefore, Hallmark "fails to meet either of the requirements for establishing an ineffective assistance of counsel claim." Manley , 664 N.W.2d at 289.
C.
Finally, Hallmark argues that the prosecution engaged in misconduct by making inflammatory comments during its opening statement, during its direct examination of the medical examiner, and during its closing argument. Hallmark does not point to which statements in the prosecution's opening argument or direct examination of the medical examiner are inflammatory. Therefore, any misconduct claim related to purportedly inflammatory statements *308 made in opening or direct examination is waived. See Palmer , 803 N.W.2d at 741.
Hallmark does identify a purportedly improper statement made during the prosecution's closing statement. He claims that the prosecutor should not have emphasized that A.M.'s recorded statement, rather than her trial testimony, should be believed. Where the alleged prosecutorial misconduct occurred during a closing argument, we " 'look to the closing argument as a whole, rather than to selected phrases and remarks.' " State v. McCray , 753 N.W.2d 746, 751 (Minn. 2008) (quoting Ture v. State , 681 N.W.2d 9, 19 (Minn. 2004) ).
We find no error. Prosecutors are permitted to argue that a witness's prior statement-admitted for its substance-should be believed over that same witness's inconsistent testimony at trial. We have noted that prosecutors can "argue all reasonable inferences from evidence in the record" so long as they do "not intentionally misstate the evidence or mislead the jury as to the inferences it may draw." Id. at 753-54 (citing ABA Standards for Criminal Justice: Prosecution Function and Defense Function, Standard 3-5.8(a) (3d ed. 1993)). Here, the prosecution's arguments about A.M.'s statements and her trial testimony conformed to the district court's direction and jury instructions that the jury could rely on A.M.'s recorded statement as substantive evidence. The prosecutor did not misstate the evidence in any way. Therefore, Hallmark's claim of prosecutorial misconduct fails.
CONCLUSION
For the foregoing reasons, we affirm Hallmark's conviction for first-degree premeditated murder. We reverse Hallmark's conviction for second-degree intentional murder and remand to the district court to vacate the conviction on that count.
Affirmed in part, reversed in part, and remanded.

Before trial, the State successfully moved to admit into evidence the 911 call-in both audio and transcript format-as an exited utterance. See Minn. R. Evid. 803(2). The admission of A.M.'s 911 call is not challenged on appeal.

When she testified at trial, A.M. acknowledged the differences between her trial testimony and her prior statements.

Hallmark attempted to dispose of the handgun by throwing it into a pond. But because the pond was frozen, the handgun merely skidded across the ice, leaving a trail, which police followed the next morning.

Minnesota Rule of Evidence 807 also requires that the proponent of the statement provide advance notice to the adverse party of its intention to offer the statement, as well as "the particulars of it, including the name, address and present whereabouts of the declarant." The State provided notice to Hallmark of its intent to offer A.M.'s statements as substantive evidence under Rule 807 several months before trial. Because notice was provided, and because Hallmark does not challenge that notice, we do not consider it here.

The court also noted that because A.M. testified and was available for cross-examination, there was no Confrontation Clause issue. The parties do not challenge that decision on appeal.

Hallmark contends that this is an impermissible consideration. He argues that A.M.'s statement was not against her penal interest because it implicated Hallmark, not A.M. He is correct that A.M.'s statement would not be admissible under the hearsay exception for unavailable declarants who make a statement against their own interests. See Minn. R. Evid. 804(b)(3) (permitting otherwise inadmissible hearsay where the declarant is unavailable and the statement is against the declarant's self-interest); Aubid , 591 N.W.2d at 480 (holding that a declarant's statement implicating a different person in a crime is not against the declarant's interest for the purposes of Rule 804(b)(3) ); see also State v. Ford , 539 N.W.2d 214, 227 (Minn. 1995). Hallmark goes on to argue, however, that because statements against penal interest are covered by a specific rule, we are precluded from considering other types of statements against interest as part of the totality of the circumstances analysis under Rule 807. We disagree. The purported inadmissibility of A.M.'s statements under Rule 804(b)(3) does not render A.M.'s motivation any less relevant to a totality of the circumstances inquiry under Rule 807. To the contrary, the inapplicability of Rules 803 and 804 is a prerequisite to even reaching Rule 807. See Minn. R. Evid. 807. Hallmark's argument that the statement should not be admitted under Rule 807 because it would not be admissible under Rule 804(b)(3) ignores the fact that Rule 807 is designed for exactly that situation.
Moreover, our precedent clearly states that it is the totality of the circumstances surrounding the making of the statement that determines trustworthiness, including the nature of the relationship between the declarant and the parties. See Griffin , 834 N.W.2d at 693. A mother choosing to voluntarily implicate her son in premeditated murder generally goes against at least some interest-whether the interest is labeled penal, parental, or familial-and renders her statement more trustworthy. A.M. testified at trial that she loved her son. And even if it is not always true that a mother would try to protect her son from a murder conviction, the "against her interest" consideration is only one factor in the totality of the circumstances analysis under Rule 807.

Counsel for Hallmark suggested at oral argument that A.M. may have been trying to avoid implicating herself when she made her statement to police. No evidence in the record supports an assertion that A.M. was responsible for the death of Russ.

The detective who took A.M.'s recorded statement testified that the informal conversation was recorded but neither the tape nor the transcript of the informal interview are included in the record.

Hallmark argues that there was no evidence connecting the Ruger handgun to the backpack itself, or that the handgun was ever in the backpack. That is true. But the evidence is still relevant because the gun went missing at the same time as the items found in the backpack, and those items are directly connected to Hallmark by fingerprints and the fact that Hallmark's identification card was found with them. This supports a reasonable inference that Hallmark was at least in the proximity of items that went missing including the handgun. Such an inference supports the conclusion that the district court did not abuse its discretion by finding the evidence relevant.

The relevant portion CRIMJIG 3.15 states:
Evidence of any prior inconsistent (statement) (conduct) should be considered only to test the believability and weight of the witness's testimony. [In the case of the defendant, however, evidence of any statement (he) (she) may have made may be considered by you for all purposes.]
10 Minn. Dist. Judges Ass'n, Minnesota Practice-Jury Instruction Guides, Criminal , CRIMJIG 3.15 (6th ed. 2018).

When the nature of a crime suggests to the district court that the defendant (1) cannot sufficiently consult with counsel "with a reasonable degree of rational understanding" or that the defendant (2) lacks a "rational as well as factual" understanding of the legal process he or she faces, the court may consider the nature of the charged crime in evaluating whether a Rule 20 competency hearing is required.